# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2020AP2038 |

| | |
|---|---|
| COMPLETE TITLE: | Donald J. Trump, Michael R. Pence and Donald J. Trump for President, Inc., |
| |         Plaintiffs-Appellants, |
| |      v. |
| | Joseph R. Biden, Kamala D. Harris, Milwaukee County Clerk c/o George L. Christenson, Milwaukee County Board of Canvassers c/o Tim Posnanski, Wisconsin Elections Commission, Ann S. Jacobs, Dane County Clerk c/o Scott McDonell and Dane County Board of Canvassers c/o Alan Arnsten, |
| |         Defendants-Respondents. |

ON PETITION TO BYPASS COURT OF APPEALS, REVIEW
OF DECISION OF THE CIRCUIT COURT

| | |
|---|---|
| OPINION FILED: | December 14, 2020 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | December 12, 2020 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
|   COURT: | Circuit Court |
|   COUNTY: | Milwaukee |
|   JUDGE: | Stephen A. Simanek |

JUSTICES:

HAGEDORN, J., delivered the majority opinion of the Court, in which ANN WALSH BRADLEY, DALLET, and KAROFSKY, JJ., joined. DALLET and KAROFSKY, JJ., filed a concurring opinion. HAGEDORN, J., filed a concurring opinion, in which ANN WALSH BRADLEY, J., joined. ROGGENSACK, C.J., filed a dissenting opinion, in which ZIEGLER and REBECCA GRASSL BRADLEY, JJ., joined. ZIEGLER, J., filed a dissenting opinion, in which ROGGENSACK, C.J., and REBECCA GRASSL BRADLEY, J., joined. REBECCA GRASSL BRADLEY, J., filed a dissenting opinion, in which ROGGENSACK, C.J., and ZIEGLER, J., joined.

NOT PARTICIPATING:

ATTORNEYS:

For the plaintiffs-appellants, a brief was filed by *James R. Troupis* and *Troupis Law Office*, Cross Plains, and *R. George Burnett* and *Conway, Olejniczak & Jerry S.C.*, Green Bay. Oral argument presented by *James R. Troupis*.

For the defendants-respondents Joseph R. Biden and Kamala D. Harris, a brief was filed by *Matthew W. O'Neill* and *Fox, O'Neill & Shannon, S.C.*, Milwaukee, *Charles G. Curtis, Jr., Michelle M. Umberger, Will M. Conley* and *Perkins Coie LLP*, Madison, and *John M. Devaney* (pro hac vice) and *Perkins Coie LLP*, Washington, D.C. Oral argument was presented by *John M. Devaney.*

For the defendants-respondents Wisconsin Elections Commission and Ann S. Jacobs, oral argument was presented by assistant attorney general *Colin T. Roth*.

NOTICE

This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.

No. 2020AP2038
 (L.C. No. 2020CV2514 & 2020CV7092)

STATE OF WISCONSIN     :     IN SUPREME COURT

---

**Donald J. Trump, Michael R. Pence and Donald J. Trump for President, Inc.,**

        **Plaintiffs-Appellants,**

    **v.**

**Joseph R. Biden, Kamala D. Harris, Milwaukee County Clerk c/o George L. Christenson, Milwaukee County Board of Canvassers c/o Tim Posnanski, Wisconsin Elections Commission, Ann S. Jacobs, Dane County Clerk c/o Scott McDonell and Dane County Board of Canvassers c/o Alan Arnsten,**

        **Defendants-Respondents.**

**FILED**

**DEC 14, 2020**

Sheila T. Reiff
Clerk of Supreme Court

---

HAGEDORN, J., delivered the majority opinion of the Court, in which ANN WALSH BRADLEY, DALLET, and KAROFSKY, JJ., joined. DALLET and KAROFSKY, JJ., filed a concurring opinion. HAGEDORN, J., filed a concurring opinion, which ANN WALSH BRADLEY, J., joined. ROGGENSACK, C.J., filed a dissenting opinion, in which ZIEGLER and REBECCA GRASSL BRADLEY, JJ., joined. ZIEGLER, J., filed a dissenting opinion, in which ROGGENSACK, C.J., and REBECCA GRASSL BRADLEY, J., joined. REBECCA GRASSL BRADLEY, J., filed a dissenting opinion, in which ROGGENSACK, C.J., and ZIEGLER, J., joined.

---

APPEAL from a judgment and an order of the Circuit Court for Milwaukee County, Stephen A. Simanek, Reserve Judge. *Affirmed.*

¶1 BRIAN HAGEDORN, J. In the 2020 presidential election, the initial Wisconsin county canvasses showed that Wisconsin voters selected Joseph R. Biden and Kamala D. Harris as the recipients of Wisconsin's electoral college votes. The petitioners[1] (collectively, the "Campaign") bring an action under Wis. Stat. § 9.01 (2017-18)[2] seeking to invalidate a sufficient number of Wisconsin ballots to change Wisconsin's certified election results. Specifically, the Campaign seeks to invalidate the ballots——either directly or through a drawdown——of more than 220,000 Wisconsin voters in Dane and Milwaukee Counties.

¶2 The Campaign focuses its objections on four different categories of ballots——each applying only to voters in Dane County and Milwaukee County. First, it seeks to strike all ballots cast by voters who claimed indefinitely confined status since March 25, 2020. Second, it argues that a form used for in-person absentee voting is not a "written application" and therefore all in-person absentee ballots should be struck. Third, it maintains that municipal officials improperly added witness information on absentee ballot certifications, and that these ballots are therefore invalid. Finally, the Campaign asserts that all ballots collected at "Democracy in the Park," two City of Madison events in late September and early October, were illegally cast.

---

[1] The petitioners are Donald J. Trump, Michael R. Pence, and Donald J. Trump for President, Inc.

[2] All subsequent references to the Wisconsin Statutes are to the 2017-18 version.

¶3   We conclude the Campaign is not entitled to the relief it seeks.  The challenge to the indefinitely confined voter ballots is meritless on its face, and the other three categories of ballots challenged fail under the doctrine of laches.

## I.   BACKGROUND

¶4   After all votes were counted and canvassing was completed for the 2020 presidential election contest, the results showed that Vice President Biden and Senator Harris won Wisconsin by 20,427 votes.  The Campaign sought a recount in two of Wisconsin's 72 counties——Milwaukee and Dane.  The Milwaukee County Elections Commission and the Dane County Board of Canvassers conducted the recount and certified the results.  The recount increased the margin of victory for Vice President Biden and Senator Harris to 20,682 votes.

¶5   The Campaign appealed those decisions in a consolidated appeal to the circuit court under Wis. Stat. § 9.01(6)(a), naming Vice President Biden, Senator Harris, the Wisconsin Elections Commission (WEC), and several election officials as respondents.[3] The circuit court[4] affirmed the determinations of the Dane County Board of Canvassers and the Milwaukee County Elections Commission

---

[3] Also named were Milwaukee County Clerk c/o George L. Christenson, Milwaukee County Board of Canvassers c/o Tim Posnanski, Ann S. Jacobs, Dane County Clerk c/o Scott McDonell, and Dane County Board of Canvassers c/o Alan Arnsten.

[4] The consolidated appeals were assigned to Reserve Judge Stephen A. Simanek.

in full. The Campaign appealed and filed a petition for bypass, which we granted.

## II. DISCUSSION

¶6 The Campaign asks this court to reverse the determinations of the Dane County Board of Canvassers and the Milwaukee County Elections Commission with respect to four categories of ballots it argues were unlawfully cast.[5] The respondents argue that all ballots were cast in compliance with the law, or at least that the Campaign has not shown otherwise. They further maintain that a multitude of legal doctrines——including laches, equitable estoppel, unclean hands, due process, and equal protection——bar the Campaign from receiving its requested relief. We agree that the challenge to the indefinitely confined voter ballots is without merit, and that laches bars the relief the Campaign seeks on the three remaining categories of challenged ballots.

### A. Indefinitely Confined Voters

¶7 Wisconsin allows voters to declare themselves indefinitely confined, provided they meet the statutory requirements. See Wis. Stat. § 6.86(2)(a).[6] These individuals

---

[5] We may set aside or modify the determination if "a provision of law" is "erroneously interpreted" and "a correct interpretation compels a particular action." Wis. Stat. § 9.01(8). We accept the findings of fact unless a factual finding "is not supported by substantial evidence." Id.

[6] Wisconsin Stat. § 6.86(2)(a) provides:

are not required to provide photo identification to obtain an absentee ballot. Id. On March 25, 2020, the Dane and Milwaukee County Clerks issued guidance on Facebook suggesting all voters could declare themselves indefinitely confined because of the pandemic and the governor's then-existing Safer-at-Home Order. This court unanimously deemed that advice incorrect on March 31, 2020, and we noted that "the WEC guidance . . . provides the clarification on the purpose and proper use of the indefinitely confined status that is required at this time." The county clerks immediately updated their advice in accordance with our decision.

¶8 The Campaign does not challenge the ballots of individual voters. Rather, the Campaign argues that all voters claiming indefinitely confined status since the date of the erroneous Facebook advice should have their votes invalidated, whether they are actually indefinitely confined or not. Although the number of individuals claiming indefinitely confined status has increased throughout the state, the Campaign asks us to apply this blanket invalidation of indefinitely confined voters only to ballots cast in Dane and Milwaukee Counties, a total exceeding

---

An elector who is indefinitely confined because of age, physical illness or infirmity or is disabled for an indefinite period may by signing a statement to that effect require that an absentee ballot be sent to the elector automatically for every election. The application form and instructions shall be prescribed by the commission, and furnished upon request to any elector by each municipality. The envelope containing the absentee ballot shall be clearly marked as not forwardable. If any elector is no longer indefinitely confined, the elector shall so notify the municipal clerk.

5

28,000 votes.  The Campaign's request to strike indefinitely confined voters in Dane and Milwaukee Counties as a class without regard to whether any individual voter was in fact indefinitely confined has no basis in reason or law; it is wholly without merit.

### B.  Laches

¶9  Three additional categories of ballots are challenged by the Campaign.  In Milwaukee and Dane Counties, the Campaign asserts all in-person absentee votes were cast unlawfully without an application, and that all absentee ballots with certifications containing witness address information added by the municipal clerks were improperly counted.  Additionally, the Campaign challenges all ballots returned at the City of Madison's "Democracy in the Park" events.

¶10 All three of these challenges fail under the longstanding and well-settled doctrine of laches.  "Laches is founded on the notion that equity aids the vigilant, and not those who sleep on their rights to the detriment of the opposing party." State ex rel. Wren v. Richardson, 2019 WI 110, ¶14, 389 Wis. 2d 516, 936 N.W.2d 587.  Application of laches is within the court's discretion upon a showing by the party raising the claim of unreasonable delay, lack of knowledge the claim would be raised, and prejudice.  Id., ¶15.

¶11  For obvious reasons, laches has particular import in the election context.  As one noted treatise explains:

> Extreme diligence and promptness are required in election-related matters, particularly where actionable

6

election practices are discovered prior to the election. Therefore, laches is available in election challenges. In fact, in election contests, a court especially considers the application of laches. Such doctrine is applied because the efficient use of public resources demands that a court not allow persons to gamble on the outcome of an election contest and then challenge it when dissatisfied with the results, especially when the same challenge could have been made before the public is put through the time and expense of the entire election process. Thus if a party seeking extraordinary relief in an election-related matter fails to exercise the requisite diligence, laches will bar the action.

29 C.J.S. Elections § 459 (2020) (footnotes omitted).

¶12 Although it disagrees the elements were satisfied here, the Campaign does not dispute the proposition that laches may bar an untimely election challenge. This principle appears to be recognized and applied universally. See, e.g., Jones v. Markiewicz-Qualkinbush, 842 F.3d 1053, 1060-61 (7th Cir. 2016) ("The obligation to seek injunctive relief in a timely manner in the election context is hardly a new concept.").[7] This case may

---

[7] See also Fulani v. Hogsett, 917 F.2d 1028, 1031 (7th Cir. 1990), cert. denied, 501 U.S. 1206 (1991) ("The candidate's and party's claims to be respectively a serious candidate and a serious party with a serious injury become less credible by their having slept on their rights."); Soules v. Kauaians for Nukolii Campaign Comm., 849 F.2d 1176, 1180 (9th Cir. 1988) ("Although adequate explanation for failure to seek preelection relief has been held to exist where, for example, the party challenging the election had no opportunity to seek such relief, if aggrieved parties, without adequate explanation, do not come forward before the election, they will be barred from the equitable relief of overturning the results of the election." (citation omitted)); Hendon v. North Carolina State Bd. of Elections, 710 F.2d 177, 182 (4th Cir. 1983) ("[F]ailure to require pre-election adjudication would 'permit, if not encourage, parties who could raise a claim to lay by and gamble upon receiving a favorable decision of the electorate and then, upon losing, seek to undo the ballot results in a court action.'"); Perry v. Judd, 471 Fed. App'x 219, 220 (4th Cir. 2012) ("Movant had every opportunity to challenge the various

Virginia ballot requirements at a time when the challenge would not have created the disruption that this last-minute lawsuit has."); McClung v. Bennett, 235 P.3d 1037, 1040 (Ariz. 2010) ("McClung's belated prosecution of this appeal . . . would warrant dismissal on the grounds of laches, because his dilatory conduct left Sweeney with only one day to file his response brief, jeopardized election officials' timely compliance with statutory deadlines, and required the Court to decide this matter on an unnecessarily accelerated basis." (citations omitted)); Smith v. Scioto Cnty. Bd. of Elections, 918 N.E.2d 131, 133-34 (Ohio 2009) ("Appellees could have raised their claims in a timely pre-election protest to the petition. 'Election contests may not be used as a vehicle for asserting an untimely protest.'" (citations omitted)); Clark v. Pawlenty, 755 N.W.2d 293, 301 (Minn. 2008) (applying laches to bar election challenge where "[t]he processes about which petitioners complain are not new"); State ex rel. SuperAmerica Grp. v. Licking Cnty. Bd. of Elections, 685 N.E.2d 507, 510 (Ohio 1997) ("In election-related matters, extreme diligence and promptness are required. Extraordinary relief has been routinely denied in election-related cases based on laches."); Tully v. State, 574 N.E.2d 659, 663 (Ill. 1991) (applying laches to bar challenge to an automatic retirement statute where a retired judge "was at least constructively aware of the fact that his seat was declared vacant" and an election had already taken place to replace him); Lewis v. Cayetano, 823 P.2d 738, 741 (Haw. 1991) ("We apply the doctrine of laches . . . because efficient use of public resources demand that we not allow persons to gamble on the outcome of the election contest then challenge it when dissatisfied with the results, especially when the same challenge could have been made before the public is put through the time and expense of the entire election process."); Evans v. State Election Bd. of State of Okla., 804 P.2d 1125, 1127 (Okla. 1990) ("It is well settled that one who seeks to challenge or correct an error of the State Election Board will be barred by laches if he does not act with diligence."); Thirty Voters of Kauai Cnty. v. Doi, 599 P.2d 286, 288 (Haw. 1979) ("The general rule is that if there has been opportunity to correct any irregularities in the election process or in the ballot prior to the election itself, plaintiffs will not, in the absence of fraud or major misconduct, be heard to complain of them afterward."); Harding v. State Election Board, 170 P.2d 208, 209 (Okla. 1946) (per curiam) ("[I]t is manifest that time is of the essence and that it was the duty of the petitioner to proceed with utmost diligence in asserting in a proper forum his claimed rights. The law favors the diligent rather than the slothful."); Mehling v. Moorehead, 14 N.E.2d 15, 20 (Ohio 1938) ("So in this case, the election, having been held,

8

be a paradigmatic example of why. The relevant election officials, as well as Vice President Biden and Senator Harris, had no knowledge a claim to these broad categories of challenges would occur. The Campaign's delay in raising these issues was unreasonable in the extreme, and the resulting prejudice to the election officials, other candidates, voters of the affected counties, and to voters statewide, is obvious and immense. Laches is more than appropriate here; the Campaign is not entitled to the relief it seeks.

---

should not be disturbed when there was full opportunity to correct any irregularities before the vote was cast."); Kewaygoshkum v. Grand Traverse Band Election Bd., 2008-1199-CV-CV, 2008-1200-CV-CV, 2008 WL 6196207, at *7 (Grand Traverse Band of Ottawa and Chippewa Indians Tribal Judiciary 2008) (en banc) ("In the instant case, nearly all of the allegations by both Plaintiffs against the Election Board relate to actions taken (or not taken) by the Election Board prior to the general election . . . . [T]hey are not timely raised at this point and should be barred under the doctrine of laches."); Moore v. City of Pacific, 534 S.W.2d 486, 498 (Mo. Ct. App. 1976) ("Where actionable election practices are discovered prior to the election, injured persons must be diligent in seeking relief."); Kelly v. Commonwealth, No. 68 MAP 2020, 2020 WL 7018314, at *1 (Penn. Nov. 28, 2020) (applying laches to bar a challenge to a mail-in voting law where challengers could have brought their claim anytime after the law's enactment more than a year prior but instead waited until after the 2020 General Election); Bowyer v. Ducey, CV-20-02321-PHX-DJH, 2020 WL 7238261, at *10 (D. Ariz. Dec. 9, 2020) (applying laches to bar claims where "affidavits or declarations upon which Plaintiffs rely clearly shows that the basis for each of these claims was either known well before Election Day or soon thereafter"); King v. Witmer, Civ. No. 20-13134, 2020 WL 7134198, at *7 (E.D. Mich. Dec. 7, 2020) ("If Plaintiffs had legitimate claims regarding whether the treatment of election challengers complied with state law, they could have brought their claims well in advance of or on Election Day——but they did not.").

9

### 1.  Unreasonable Delay

¶13  First, the respondents must prove that the Campaign unreasonably delayed in bringing the challenge.  What constitutes an unreasonable delay varies and "depends on the facts of a particular case."  Wis. Small Bus. United, Inc. v. Brennan, 2020 WI 69, ¶14, 393 Wis. 2d 308, 946 N.W.2d 101.  As we have explained:

> [U]nreasonable delay in laches is based not on what litigants know, but what they might have known with the exercise of reasonable diligence.  This underlying constructive knowledge requirement arises from the general rule that ignorance of one's legal rights is not a reasonable excuse in a laches case.  Where the question of laches is in issue, the plaintiff is chargeable with such knowledge as he might have obtained upon inquiry, provided the facts already known by him were such as to put a man of ordinary prudence upon inquiry.  To be sure, what we expect will vary from case to case and litigant to litigant. But the expectation of reasonable diligence is firm nonetheless.

Wren, 389 Wis. 2d 516, ¶20 (citations and quotation marks omitted).  Here, the Campaign unreasonably delayed with respect to all three categories of challenged ballots.

¶14  Regarding the Campaign's first challenge, Wisconsin law provides that a "written application" is required before a voter can receive an absentee ballot, and that any absentee ballot issued without an application cannot be counted.  See Wis. Stat. § 6.86(1)(ar); Wis. Stat. § 6.84(2).  The Campaign argues all in-person absentee votes in Dane and Milwaukee Counties were cast without the required application.

¶15  But both counties did use an application form created, approved, and disseminated by the chief Wisconsin elections agency.  This form, now known as EL-122, is entitled "Official

10

Absentee Ballot Application/Certification." It was created in 2010 in an effort to streamline paperwork following the 2008 election, and has been available and in use ever since.

¶16 The Campaign does not challenge that any individual voters' ballots lacked an application——an otherwise appropriate and timely issue. Rather, the Campaign argues this "application" is not an application, or that municipal clerks do not give this form to voters before distributing the ballot, in contravention of the statutes.[8] Regardless of the practice used, the Campaign would like to apply its challenge to the sufficiency of EL-122 to strike 170,140 votes in just two counties——despite the form's use in municipalities throughout the state.[9] Waiting until after an election to challenge the sufficiency of a form application in use statewide for at least a decade is plainly unreasonable.

¶17 The second category of ballots challenged are those with certificates containing witness address information added by a municipal clerk. Absentee ballots must be witnessed, and the witness must provide their name, signature, and address on the certification (printed on the back side of the envelope in which the absentee ballot is ultimately sealed). Wis. Stat. § 6.87(2), (4)(b)1., (6d). While a witness address must be provided on the

---

[8] According to the findings of fact, the practice in Dane and Milwaukee Counties is that the application portion of the envelope is completed and shown to an official before the voter receives a ballot.

[9] In its findings of fact, the circuit court concluded that 651,422 voters throughout the state used Form EL-122 in the 2020 presidential election.

11

certification for the corresponding ballot to be counted, the statute is silent as to what portion of an address the witness must provide.  § 6.87(6d).

¶18  The process of handling missing witness information is not new; election officials followed guidance that WEC created, approved, and disseminated to counties in October 2016.  It has been relied on in 11 statewide elections since, including in the 2016 presidential election when President Trump was victorious in Wisconsin.  The Campaign nonetheless now seeks to strike ballots counted in accordance with that guidance in Milwaukee and Dane Counties, but not those counted in other counties that followed the same guidance.  The Campaign offers no reason for waiting years to challenge this approach, much less after this election.  None exists.

¶19  Finally, the City of Madison held events on September 27, 2020, and October 3, 2020, dubbed "Democracy in the Park."  At these events, sworn city election inspectors collected completed absentee ballots.  The city election inspectors also served as witnesses if an elector brought an unsealed, blank ballot.  No absentee ballots were distributed, and no absentee ballot applications were accepted or distributed at these events.

¶20  The Campaign characterizes these events as illegal early in-person absentee voting.  When the events were announced, an attorney for the Wisconsin Legislature sent a warning letter to the City of Madison suggesting the events were illegal.  The City of Madison responded that the events were legally compliant, offering reasons why.  Although these events and the legislature's

12

concerns were widely publicized, the Campaign never challenged these events, nor did any other tribunal determine they were unlawful.

¶21 The Campaign now asks us to determine that all 17,271 absentee ballots collected during the "Democracy in the Park" events were illegally cast. Once again, when the events were announced, the Campaign could have challenged its legality. It did not. Instead, the Campaign waited until after the election—— after municipal officials, the other candidates, and thousands of voters relied on the representations of their election officials that these events complied with the law. The Campaign offers no justification for this delay; it is patently unreasonable.

¶22 The time to challenge election policies such as these is not after all ballots have been cast and the votes tallied. Election officials in Dane and Milwaukee Counties reasonably relied on the advice of Wisconsin's statewide elections agency and acted upon it. Voters reasonably conformed their conduct to the voting policies communicated by their election officials. Rather than raise its challenges in the weeks, months, or even years prior, the Campaign waited until after the votes were cast. Such delay in light of these specific challenges is unreasonable.

## 2. Lack of Knowledge

¶23 The second element of laches requires that the respondents lacked knowledge that the Campaign would bring these

claims.[10] The respondents all assert they were unaware that the Campaign would challenge various election procedures after the election, and nothing in the record suggests otherwise. On the record before us, this is sufficient to satisfy this element. See Brennan, 393 Wis. 2d 308, ¶18.

### 3. Prejudice

¶24 Finally, the respondents must also prove that prejudice results from the Campaign's unreasonable delay. "What amounts to prejudice . . . depends upon the facts and circumstances of each case, but it is generally held to be anything that places the party in a less favorable position." Wren, 389 Wis. 2d 516, ¶32.

¶25 With respect to in-person absentee ballot applications, local election officials used form EL-122 in reliance on longstanding guidance from WEC. Penalizing the voters election officials serve and the other candidates who relied on this longstanding guidance is beyond unfair. The Campaign sat on its hands, waiting until after the election, despite the fact that this "application" form was in place for over a decade. To strike

---

[10] While our cases have identified this element as a general requirement for laches, it does not always appear to be applicable. To some extent, this requirement focuses on the ability of the asserting party to mitigate any resulting prejudice when notice is provided. But this may not be possible in all types of claims. Most jurisdictions do not identify lack of knowledge as a separate, required element in every laches defense. See, e.g., Hart v. King, 470 F. Supp. 1195, 1198 (D. Haw. 1979) (holding that laches barred relief in federal court notwithstanding plaintiffs' unsuccessful pre-election suit in state court). In any event, we have no difficulty finding this element satisfied here.

ballots cast in reliance on the guidance now, and to do so only in two counties, would violate every notion of equity that undergirds our electoral system.

¶26 As for the ballots to which witness address information was added, the election officials relied on this statewide advice and had no reason to question it. Waiting until after the election to raise the issue is highly prejudicial. Applying any new processes to two counties, and not statewide, is also unfair to nearly everyone involved in the election process, especially the voters of Dane and Milwaukee Counties.

¶27 Finally, the respondents, and indeed all voters, are prejudiced if the ballots collected at the "Democracy in the Park" events are invalidated. Voters were encouraged to utilize the events, and 17,000 voters did so in reliance on representations that the process they were using complied with the law. Striking these ballots would disenfranchise voters who did nothing wrong when they dropped off their ballot where their local election officials told them they could.

¶28 In short, if the relief the Campaign sought was granted, it would invalidate nearly a quarter of a million ballots cast in reliance on interpretations of Wisconsin's election laws that were well-known before election day. It would apply new interpretive guidelines retroactively to only two counties. Prejudice to the respondents is abundantly clear. <u>Brennan</u>, 393 Wis. 2d 308, ¶25.

15

### 4. Discretion

¶29 Whether to apply laches remains "within our equitable discretion." Id., ¶26. Doing so here is more than equitable; it is the only just resolution of these claims.

¶30 To the extent we have not made this clear in the past, we do so now. Parties bringing election-related claims have a special duty to bring their claims in a timely manner. Unreasonable delay in the election context poses a particular danger——not just to municipalities, candidates, and voters, but to the entire administration of justice. The issues raised in this case, had they been pressed earlier, could have been resolved long before the election. Failure to do so affects everyone, causing needless litigation and undermining confidence in the election results. It also puts courts in a difficult spot. Interpreting complicated election statutes in days is not consistent with best judicial practices. These issues could have been brought weeks, months, or even years earlier. The resulting emergency we are asked to unravel is one of the Campaign's own making.[11]

¶31 The claims here are not of improper electoral activity. Rather, they are technical issues that arise in the administration of every election. In each category of ballots challenged, voters

---

[11] Our decision that the Campaign is not entitled to the relief it seeks does not mean the legal issues presented are foreclosed from further judicial scrutiny. Wisconsin law provides sufficient mechanisms for challenging unlawful WEC guidance or unlawful municipal election practices. Nothing in our decision denying relief to the Campaign would affect the right of another party to raise substantive challenges.

16

followed every procedure and policy communicated to them, and election officials in Dane and Milwaukee Counties followed the advice of WEC where given. Striking these votes now——after the election, and in only two of Wisconsin's 72 counties when the disputed practices were followed by hundreds of thousands of absentee voters statewide——would be an extraordinary step for this court to take.[12] We will not do so.

## III. CONCLUSION

¶32 Our laws allow the challenge flag to be thrown regarding various aspects of election administration. The challenges raised by the Campaign in this case, however, come long after the last play or even the last game; the Campaign is challenging the rulebook adopted before the season began. Election claims of this type must be brought expeditiously. The Campaign waited until after the election to raise selective challenges that could have been raised long before the election. We conclude the challenge to indefinitely confined voter ballots is without merit, and that laches bars relief on the remaining three categories of challenged ballots. The Campaign is not entitled to relief, and therefore

---

[12] Granting the relief requested by the Campaign may even by unconstitutional. See Bush v. Gore, 531 U.S. 98, 104-05 (per curiam) ("The right to vote is protected in more than the initial allocation of the franchise. Equal protection applies as well to the manner of its exercise. Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another.").

17

does not succeed in its effort to strike votes and alter the certified winner of the 2020 presidential election.

*By the Court.*—The judgment of the circuit court is affirmed.

¶33 REBECCA FRANK DALLET and JILL J. KAROFSKY, JJ. (*concurring*). As acknowledged by the President's counsel at oral argument, the President would have the people of this country believe that fraud took place in Wisconsin during the November 3, 2020 election. Nothing could be further from the truth. The President failed to point to even one vote cast in this election by an ineligible voter; yet he asks this court to disenfranchise over 220,000 voters. The circuit court, whose decision we affirm, found no evidence of any fraud.

¶34 The evidence does show that, despite a global pandemic, more than 3.2 million Wisconsinites performed their civic duty. More importantly as it relates to this lawsuit, these voters followed the rules that were in place at the time. To borrow Justice Hagedorn's metaphor, Wisconsin voters complied with the election rulebook. No penalties were committed and the final score was the result of a free and fair election.

¶35 For the foregoing reasons, we concur.

¶36 BRIAN HAGEDORN, J. *(concurring).* I agree, of course, with the majority opinion I authored holding that the petitioners[1] (collectively, the "Campaign") are not entitled to the relief they seek. But I understand the desire for at least some clarity regarding the underlying election administration issues. A comprehensive analysis is not possible or appropriate in light of the abbreviated nature of this review and the limited factual record in an action under Wis. Stat. § 9.01 (2017-18).[2] However, I do think we can be of some assistance, and will endeavor to address in some measure the categories of ballots the majority opinion properly applies laches to.

¶37 Beyond its challenge to indefinitely confined voters, an issue the court's opinion quickly and appropriately dispenses with, the Campaign raises challenges to three categories of ballots: (1) all in-person absentee ballots in Dane and Milwaukee Counties for want of an absentee ballot application; (2) all absentee ballots in Dane and Milwaukee Counties where municipal officials added witness address information on the certification; and (3) all ballots collected at two City of Madison "Democracy in the Park" events occurring in late September and early October. I begin with some background, and address each while remaining mindful of the limited nature of this review.

---

[1] The petitioners are Donald J. Trump, Michael R. Pence, and Donald J. Trump for President, Inc.

[2] All subsequent references to the Wisconsin Statutes are to the 2017-18 version.

1

I. LEGAL BACKGROUND

¶38 Elections in Wisconsin are governed by Chapters five through 12 of the Wisconsin Statutes. In applying these laws, we have a long history of construing them to give effect to the ascertainable will of the voter, notwithstanding technical noncompliance with the statutes. Roth v. Lafarge Sch. Dist. Bd. of Canvassers, 2004 WI 6, ¶19, 268 Wis. 2d 335, 677 N.W.2d 599.[3] This longstanding practice is confirmed in statute. Wisconsin Stat. § 5.01(1) says, "Except as otherwise provided, chs. 5 to 12 shall be construed to give effect to the will of the electors, if that can be ascertained from the proceedings, notwithstanding informality or failure to fully comply with some of their provisions." So generally, when ballots are challenged, they are counted if the will of the voter can be ascertained.

¶39 Wisconsin looks quite a bit more skeptically, however, at absentee ballots. Wisconsin Stat. § 6.84(2) provides:

> Notwithstanding [Wis. Stat. §] 5.01(1), with respect to matters relating to the absentee ballot process, [Wis. Stat. §§] 6.86, 6.87(3) to (7) and 9.01(1)(b)2. and 4. shall be construed as mandatory. Ballots cast in

---

[3] See also State ex rel. Wood v. Baker, 38 Wis. 71, 89 (1875) ("It would be a fraud on the constitution to hold them disfranchised without notice or fault. They went to the election clothed with a constitutional right of which no statute could strip them, without some voluntary failure on their own part to furnish statutory proof of right. And it would be monstrous in us to give such an effect to the registry law, against its own spirit and in violation of the letter and spirit of the constitution."); State ex rel. Blodgett v. Eagan, 115 Wis. 2d 417, 421, 91 N.W. 984 (1902) ("when the intention of the voter is clear, and there is no provision of statute declaring that such votes shall not be counted, such intention shall prevail"); Roth v. Lafarge Sch. Dist. Bd. of Canvassers, 2004 WI 6, ¶¶19-25, 268 Wis. 2d 335, 677 N.W.2d 599 (collecting cases).

> contravention of the procedures specified in those provisions may not be counted. Ballots counted in contravention of the procedures specified in those provisions may not be included in the certified result of any election.

This tells us that, to the extent an absentee ballot does not comply with certain statutory requirements, it may not be counted.[4]

¶40 Our review in this case is of the determinations of the board of canvassers and elections commission. The determination shall be "set aside or modif[ied]" if the board of canvassers or elections commission "has erroneously interpreted a provision of law and a correct interpretation compels a particular action." § 9.01(8)(d). We "may not substitute [our] judgment for that of the board of canvassers . . . as to the weight of the evidence on any disputed findings of fact." Id. However, findings of fact "not supported by substantial evidence" shall be set aside. Id. Legal conclusions made by the board of canvassers or elections commission are reviewed independently. Roth, 268 Wis. 2d 335, ¶15.

¶41 With this framework in mind, I turn to the three specific categories of ballots challenged here.

### II.  IN-PERSON ABSENTEE BALLOT APPLICATIONS

¶42 Wisconsin Stat. § 6.86(1)(ar) says that "the municipal clerk shall not issue an absentee ballot unless the clerk receives

---

[4] Wisconsin courts have had few opportunities to opine on this statute. The court appeals noted in a 2001 case: "Section 6.84(2)'s strict construction requirement, applicable to statutes relating to the absentee ballot process, is consistent with the guarded attitude with which the legislature views that process." Lee v. Paulson, 2001 WI App 19, ¶7, 241 Wis. 2d 38, 623 N.W.2d 577.

a written application therefor from a qualified elector of the municipality." The mandatory requirement is that each ballot be matched with an application.

¶43 The Wisconsin Elections Commission (WEC) has designed, approved, and distributed forms for statewide use by local election officials. Among the forms are a separate absentee ballot application (form EL-121) and a combined application and certification (form EL-122). Milwaukee and Dane Counties, like many other communities around the state, use form EL-122 for in-person absentee voters. The Campaign argues that form EL-122 is not an application, and that all 170,140 in-person absentee ballots cast in Dane and Milwaukee Counties therefore lacked the required "written application." This argument is incorrect.

¶44 "Written application" is not specially defined in the election statutes, nor is any particular content prescribed. EL-122 is entitled "Official Absentee Ballot Application/Certification." (Emphasis added). Beyond containing basic voter information also present on EL-121, Form EL-122 requires the elector to sign, stating: "I further certify that I requested this ballot." This would appear to satisfy the ordinary meaning of a written ballot application. See Quick Charge Kiosk LLC v. Kaul, 2020 WI 54, ¶18, 392 Wis. 2d 35, 944 N.W.2d 598 ("When statutory language is not specially defined or technical, it is given its 'common, ordinary, and accepted meaning.'" (quoting State ex rel. Kalal v. Circuit Court for Dane Cnty., 2004 WI 58, ¶45, 271 Wis. 2d 633, 681 N.W.2d 110)).

4

¶45 The record further bears out its function as an application. In both Milwaukee and Dane Counties, voters completed the application portion of EL-122 and showed it to an election official before receiving a ballot.[5] Then, after completing the ballot, the voter signed the certification portion of the form, which the clerk witnessed. Section 6.86(1)(ar) contains no requirement that the application and certification appear on separate documents, and the facts demonstrate that the application was completed before voters received a ballot. As best I can discern from this record, EL-122 is a "written application" within the meaning of § 6.86(1)(ar). That it also serves as a ballot certification form does not change its status as an application.[6]

¶46 Therefore, on the merits and the record before us, in-person absentee voters using form EL-122 in Dane and Milwaukee Counties did so in compliance with Wisconsin law.[7]

---

[5] The Campaign appears to suggest a different sequence of events, but that is not what the record before us reflects.

[6] It is not unusual or inherently problematic for administrative forms to have multiple functions. The MV1, for example, serves as both an application for registration under Wis. Stat. § 341.08 and an application for a certificate of title under Wis. Stat. § 342.06. See https://wisconsindot.gov/Documents/formdocs/mv1.pdf.

[7] It is presently unclear whether the statutes would be better or more clearly effectuated by separating the application and certification, or whether certain retention practices may be problematic. The expedited nature of our review of this case does not permit a full examination of this question. But the mandatory procedure insofar as the voter is concerned——that he or she fill out a written application——is surely satisfied.

5

III. WITNESS ADDRESSES

¶47 The Campaign also challenges several thousand absentee ballots cast in Milwaukee and Dane Counties where election officials added missing witness address information to the certification. This challenge is oddly postured and seems to miss the statutory requirements.

¶48 Absentee ballots cast in Wisconsin must be witnessed. Wis. Stat. § 6.87(4)(b)1. In order to comply with this requirement, voters place absentee ballots in an unsealed envelope, the back of which includes a certificate. § 6.87(2). The certificate must include a statement for the witness to certify, along with space for the witness's signature, printed name, and "[a]ddress." Id. The law states that the "witness shall execute" the relevant witness information——including, one would presume, the required address. Id. "If a certificate is missing the address of a witness, the ballot may not be counted." § 6.87(6d).

¶49 Although Wis. Stat. § 6.87(6d) requires an address, § 6.87(2) and (6d) are silent on precisely what makes an address sufficient. This is in stark contrast to other provisions of the election statutes that are more specific. For example, Wis. Stat. § 6.34(3)(b)2. requires an identifying document to contain "[a] current and complete residential address, including a numbered street address, if any, and the name of the municipality" for the document to be considered proof of residence. Similarly, Wis. Stat. § 6.18 requires former residents to swear or affirm their Wisconsin address as follows: "formerly residing at . . . in

6

the . . . ward . . . aldermanic district (city, town, village) of . . . County of . . . ."[8] While the world has surely faced more pressing questions, the contours of what makes an address an address has real impact.  Would a street address be enough, but no municipality?  Is the state necessary?  Zip code too?  Does it matter if the witness uses their mailing address and not the residential address (which can be different)?

¶50  Based on the record before the court, it is not clear what information election officials added to what number of certifications.  Wisconsin Stat. § 6.87(6d) would clearly prohibit counting a ballot if the entire address is absent from the certification.  However, if the witness provided only part of the address——for example, a street address and municipality, but no state name or zip code——it is at least arguable that this would satisfy § 6.87(6d)'s address requirement.  And, to the extent clerks completed addresses that were already sufficient under the

---

[8] "And 'absent textual or structural clues to the contrary' a particular word or phrase used more than once in the same act is understood 'to carry the same meaning each time.'"  Town of Delafield v. Central Transport Kriewaldt, 2020 WI 61, ¶15 n.6, 392 Wis. 2d 427, 944 N.W.2d 819 (quoting State ex rel. DNR v. Wis. Court of Appeals, Dist. IV, 2018 WI 25, ¶30, 380 Wis. 2d 354, 909 N.W.2d 114).

statute, I am not aware of any authority that would allow such votes to be struck.[9]

¶51 The parties did not present comprehensive arguments regarding which components of an address are necessary under the statute. It would not be wise to fully address that question now. But I do not believe the Campaign has established that all ballots where clerks added witness address information were necessarily insufficient and invalid; the addresses provided directly by the witnesses may very well have satisfied the statutory directive. The circuit court's findings of fact reflect that many of these ballots contained additions of the state name and/or zip code. I conclude the Campaign failed to provide sufficient information to show all the witness certifications in the group identified were improper, or moreover, that any particular number of ballots were improper.

¶52 Although I do not believe the Campaign has offered sufficient proof on this record to strike ballots, this broader issue appears to be a valid election administration concern. WEC, other election officials, the legislature, and others may wish to

_____

[9] The statute seems to suggest only the witness should fill in the information necessary to comply with the statute. See Wis. Stat. § 6.87(2) ("the witness shall execute . . ."). If a zip code is not required under the statute, for example, I'm not sure clerks would be prohibited from adding the zip code. Then again, I'm not sure why they would want to add anything to an already sufficient ballot, or what their authority would be to do so. It's possible WEC guidance to add witness information is aimed at complying with related WEC guidance that all aspects of a mailing address——including city, state, and zip code——should be included in the witness certification (arguably, information the statute does not always require). Regardless, this case is not well-postured to answer these questions.

8

examine the requirements of the statute and measure them against the guidance and practice currently in place to avoid future problems.

## IV. DEMOCRACY IN THE PARK

¶53 Finally, the Campaign challenges 17,271 ballots the City of Madison collected at "Democracy in the Park" events on September 27, 2020, and October 3, 2020. According to the record, at these events, sworn city election inspectors collected already completed absentee ballots and served as witnesses for absentee voters who brought an unsealed, blank ballot with them. During the events, no absentee ballots were distributed, and no absentee ballot applications were distributed or received.

¶54 Under the law, when a voter requests an absentee ballot, the voter must return the absentee ballot in a sealed envelope by mail or "in person, to the municipal clerk issuing the ballot or ballots." Wis. Stat. § 6.87(4)(b)1. The phrase "municipal clerk" has a specific meaning in the election statutes. It is defined as "the city clerk, town clerk, village clerk and the executive director of the city election commission and their authorized representatives." Wis. Stat. § 5.02(10) (emphasis added).[10] A sworn city election inspector sent by the clerk to collect ballots would seem to be an authorized representative as provided in the definition. Even if "municipal clerk" were not a specially-defined

---

[10] When words are "specially-defined" they are given their "special definitional meaning." State ex rel. Kalal v. Circuit Court for Dane Cnty., 2004 WI 58, ¶45, 271 Wis. 2d 633, 681 N.W.2d 110.

9

term, the only reasonable reading of the law would allow those acting on a clerk's behalf to receive absentee ballots, not just the clerk by him or herself. After all, many clerks manage a full office of staff to assist them in carrying out their duties. Accordingly, voters who returned ballots to city election inspectors at the direction of the clerk returned their absentee ballots "in person, to the municipal clerk" as required by § 6.87(4)(b)1.

¶55 The Campaign, however, asserts that the "Democracy in the Park" events were illegal in-person absentee voting sites that failed to meet the statutory requirements under Wis. Stat. § 6.855. Section 6.855(1) provides in relevant part:

> The governing body of a municipality may elect to designate a site other than the office of the municipal clerk or board of election commissioners as the location from which electors of the municipality may request and vote absentee ballots and to which voted absentee ballots shall be returned by electors for any election. . . . If the governing body of a municipality makes an election under this section, no function related to voting and return of absentee ballots that is to be conducted at the alternate site may be conducted in the office of the municipal clerk or board of election commissioners.

§ 6.855(1) (emphasis added).

¶56 An alternative absentee ballot site, then, must be a location not only where voters may return absentee ballots, but also a location where voters "may request and vote absentee ballots." Id. On the facts before the court, this is not what occurred at "Democracy in the Park" locations. Ballots were not requested or distributed. Therefore, Wis. Stat. § 6.855 is not on point.

10

¶57 In short, based on the record before the court and the arguments presented, I see no basis to conclude the ballots collected at "Democracy in the Park" events were cast in contravention of Wisconsin law. This challenge fails.

## V. CONCLUSION

¶58 The people of Wisconsin deserve confidence that our elections are free and fair and conducted in compliance with the law. Our elected leaders and election officials, including those at WEC, should continue to earn the trust of all Wisconsinites. The claims made by the Campaign in this case are not of widespread fraud or serious election improprieties. These are ordinary sorts of election administration issues——for example, challenging whether an "application" form in use statewide for a decade constitutes a sufficient application (it does). While this does not diminish the importance of the election procedures the legislature has chosen, Wisconsin's electorate should be encouraged that the issues raised in this case are focused on rather technical issues such as whether a witness must include their zip code as part of their address.

¶59 That does not mean there is nothing to improve or clarify or correct. But as explained in the majority opinion, the Campaign waited far too long to challenge guidance and practices established weeks, months, or years earlier. Laches rightly bars the relief the Campaign seeks. Even on the merits, however, the Campaign is either incorrect on the law, or does not provide sufficient proof to identify particular ballots that were improperly cast. At the

11

end of the day, nothing in this case casts any legitimate doubt that the people of Wisconsin lawfully chose Vice President Biden and Senator Harris to be the next leaders of our great country. While the Campaign has every right to challenge ballots cast out of compliance with the law, its efforts to make that showing in this case do not succeed.

¶60  I am authorized to state that Justice ANN WALSH BRADLEY joins this concurrence.

¶61 PATIENCE DRAKE ROGGENSACK, C.J. *(dissenting).* Elections have consequences. One candidate wins and the other loses, but in every case, it is critical that the public perceive that the election was fairly conducted.

¶62 In the case now before us, a significant portion of the public does not believe that the November 3, 2020, presidential election was fairly conducted. Once again, four justices on this court cannot be bothered with addressing what the statutes require to assure that absentee ballots are lawfully cast. I respectfully dissent from that decision. I write separately to address the merits of the claims presented.[1]

¶63 The Milwaukee County Board of Canvassers and the Dane County Board of Canvassers based their decisions on erroneous advice when they concluded that changes clerks made to defective witness addresses were permissible. And, the Dane County Board of Canvassers erred again when it approved the 200 locations for ballot collection that comprised Democracy in the Park. The majority does not bother addressing what the boards of canvassers did or should have done, and instead, four members of this court throw the cloak of laches over numerous problems that will be repeated again and again, until this court has the courage to correct them. The electorate expects more of us, and we are

---

[1] See Antonin Scalia, The Dissenting Opinion, 1994 J. Sup. Ct. Hist. 33 (1994) ("Legal opinions are important, after all, for the reasons they give, not the results they announce; results can be announced in judgment orders without opinion. An opinion that gets the reasons wrong gets everything wrong which is the function of an opinion to produce.").

1

capable of providing it.[2]  Because we do not, I respectfully dissent.

## I.  BACKGROUND

¶64  On November 3, 2020, people across Wisconsin and across the country exercised their constitutional right to vote.  When the initial Wisconsin canvass was completed on November 17, 2020, Joseph R. Biden and Kamala D. Harris received 20,427 more votes than Donald J. Trump and Michael R. Pence.

¶65  On November 18, 2020, President Trump, Vice President Pence and the Trump campaign (the Petitioners) filed recount petitions in Milwaukee and Dane Counties.  The recount petitions alleged that the following errors occurred during the election in both counties:

(1)  Municipal clerks improperly completed missing information on absentee ballot envelopes related to witness addresses;

(2)  In-person absentee voters did not submit written applications for an absentee ballot; and

(3)  Voters who were not indefinitely confined claimed "indefinitely confined" status for the purposes of obtaining an absentee ballot without having to show a photo identification.

¶66  In addition to the above allegations raised during both recounts, in Dane County, the Petitioners alleged error in counting

---

[2] See, e.g, Texas v. Pennsylvania, 592 U.S. ____, ____ (slip op., at 1) (Dec. 11, 2020) (order denying motion to file bill of complaint) (Alito and Thomas, J.J., statement on the denial of Texas's motion to file a bill of complaint) ("In my view we do not have discretion to deny the filing of a bill of complaint in a case that falls within our original jurisdiction. . . . I would therefore grant the motion to file the bill of complaint but would not grant other relief, and I express no view on any other issue")(internal citation omitted).

all ballots received during Democracy in the Park events in Madison on September 26, 2020, and October 3, 2020.

¶67 The recount lasted from November 20, 2020, to November 29, 2020.[3] During the recount process, the Petitioners objected to irregularities in how the voting was conducted pursuant to Wis. Stat. § 9.01(5) (2017-18).[4] Many irregularities were grounded in Wisconsin Elections Commission (WEC) advice on voting process. The boards of canvassers overruled all of the Petitioners' irregularity objections.

¶68 As they relate to each alleged irregularity, the counties rejected the Petitioners' arguments for the following reasons:

(1) Municipal clerks improperly completed missing information on absentee ballot envelopes related to witness addresses.

> The Milwaukee County Board of Canvassers moved to accept ballots from envelopes with witness addresses that had been completed by clerks consistent with specific guidance by the WEC, which the Board viewed as consistent with Wis. Stat. § 6.87(6d).

> The Dane County Board of Canvassers also declined to "exclude envelopes that had a witness address added by the clerk."

(2) In-person absentee voters did not submit written applications for an absentee ballot.

---

[3] Milwaukee County completed and certified its results on November 27, 2020, and Dane County completed and certified its recount results on November 29, 2020.

[4] All further references to the Wisconsin Statutes are to the 2017-18 version.

The Milwaukee County Board of Canvassers determined that there are multiple forms of application for an absentee ballot that can be made by absentee in-person voters and that the absentee ballot envelope provided to absentee in-person voters – which has the word "application" stated on it and must be completed by the voter – is an application for an absentee ballot. The Milwaukee Board thus rejected the Trump Campaign's challenge to ballots cast by in-person absentee voters.

The Dane County Board of Canvassers voted not to exclude or draw down any absentee ballots on the basis that they "do not have an attached or identifiable application." . . . The Dane County Board of Canvassers concluded that review of absentee ballot applications is not a part of the statutory recount process under Wis. Stat. § 9.01(1)(b) and therefore the applications were not relevant to the recount.

(3) Voters who were not indefinitely confined claimed "indefinitely confined" status for the purposes of obtaining an absentee ballot without having to show a photo identification.

The Milwaukee County Board of Canvassers found that "a designation of an indefinitely confined status is for each individual voter to make based upon their current circumstances" and that "no evidence of any voter in Milwaukee County [was] offered that has abused this process and voted through this status . . . not even an allegation that there was a single voter who abused this process to vote without providing proof of their ID, but eliminating proof that anyone did so. So there's no allegation . . . no proof . . . no evidence." . . . The Board voted to overrule any challenge to a voter with the status of "indefinitely confined."

The Dane County Board of Canvassers also rejected the Trump Campaign's challenge that would have required invalidating the ballots of all electors in Dane County who declared indefinitely confined status. The Board specifically declined to separate or "draw down" the ballots cast by electors who declared indefinitely confined status.

(4) Ballots received during democracy in the park.

The Dane County Board of Canvassers denied the challenge, ruling that the Democracy in the Park events

4

were the equivalent of a human drop box and valid under the statute.

¶69 On December 1, 2020, the Petitioners filed a petition for leave to file an original action with us. We denied that petition on December 3, 2020. That same day, the Petitioners filed two notices of appeal of the recount determinations pursuant to Wis. Stat. § 9.01(6)(a). Those cases were consolidated in Milwaukee County and the Honorable Stephen Simanek was assigned to the appeal pursuant to § 9.01(6)(b).

¶70 The circuit court held a hearing on December 11, 2020. At the conclusion of oral argument, the circuit court affirmed the recount determinations and, in so doing, adopted pages one through thirty of the Respondents' Joint Proposed Findings of Fact and Conclusions of Law. After the circuit court entered its final written decision, the Petitioners filed a notice of appeal. The Petitioners also filed a petition for bypass under Wis. Stat. § 809.60(1). Thereafter, we granted the petition for bypass and assumed jurisdiction over this appeal.

## II. DISCUSSION

### A. Standard of Review

¶71 In a Wis. Stat. § 9.01 proceeding, post election challenges "are permissible provided that they may affect the election results." Logerquist v. Board of Canvassers for Town of Nasewaupee, 150 Wis. 2d 907, 916, 442 N.W.2d 551 (Ct. App. 1989). In such a proceeding, we review the determinations of the board of canvassers, not those of the circuit court. Id. at 917. "On appellate review of a [] § 9.01(1) proceeding, the question is whether the board [of canvasser's] findings are supported by

5

substantial evidence.[5]  Carlson v. Oconto Bd. of Canvassers, 2001 WI App 20, ¶5, 240 Wis. 2d 438, 623 N.W.2d 195 (citing Logerquist, 150 Wis. 2d at 912).

¶72  This appeal also requires us to interpret and apply Wisconsin statutes.  We interpret and apply statutes independently as questions of law, while benefitting from the discussion of the circuit court.  Voces De La Frontera, Inc. v. Clarke, 2017 WI 16, ¶12, 373 Wis. 2d 348, 891 N.W.2d 803.

### B.  Alleged Irregularities

¶73  "If WEC has been giving advice contrary to statute, those acts do not make the advice lawful.  WEC must follow the law.  We, as the law declaring court, owe it to the public to declare whether WEC's advice is incorrect.  However, doing so does not necessarily lead to striking absentee ballots that were cast by following incorrect WEC advice.  The remedy Petitioners seek may be out of reach for a number of reasons."  Trump v. Evers, No. 2020AP1917-OA, unpublished order (Wis. Dec. 3, 2020) (Roggensack, C.J., dissenting from the denial of the petition for leave to commence an original action).

¶74  This case is guided by Wis. Stat. § 6.84 which provides:

> The legislature finds that voting is a constitutional right, the vigorous exercise of which should be strongly encouraged.  In contrast, voting by absentee ballot is a privilege exercised wholly outside the traditional safeguards of the polling place.  The legislature finds that the privilege of voting by absentee ballot must be carefully regulated to prevent the potential for fraud or abuse; to prevent overzealous solicitation of absent

---

[5] In the matter before us, the material facts are not disputed.  Rather, it is the legal consequences that follow from these facts that forms the controversy.

electors who may prefer not to participate in an election; to prevent undue influence on an absent elector to vote for or against a candidate or to cast a particular vote in a referendum; or other similar abuses.

Notwithstanding s. 5.01, with respect to matters relating to the absentee ballot process, ss. 6.86, 6.87(3) to (7) and 9.01(1)(b)2. and 4. shall be construed as mandatory. Ballots cast in contravention of the procedures specified in those provisions may not be counted. Ballots counted in contravention of the procedures specified in those provisions may not be included in the certified result of any election.

Accordingly, the provisions that relate to obtaining and voting absentee ballots must be carefully examined as a recount proceeds.[6]

### C. Witness Addresses

¶75 Wisconsin Stat. § 6.87(2) provides that absentee ballots must be accompanied by a certificate. The certificate may be printed on the envelope in which an absentee ballot is enclosed. Section 6.87(2) provides a model certificate, and directs that certificates must be in "substantially" the same form as the model. The model provides:

The witness shall execute the following:

I, the undersigned witness, subject to the penalties of s. 12.60 (1)(b), Wis. Stats., for false statements, certify that I am an adult U.S. citizen and that the above statements are true and the voting procedure was executed as there stated. I am not a candidate for any office on the enclosed ballot (except in the case of an incumbent municipal clerk). I did not solicit or advise the elector to vote for or against any candidate or measure.

---

[6] See also Griffin v. Roupas, 385 F.3d 1128, 1130-31 (7th Cir. 2004) ("Voting fraud is a serious problem in U.S. elections generally . . . and it is facilitated by absentee voting. In this respect absentee voting is to voting in person as a take-home exam is to a proctored one." (internal citations omitted)).

> > ....(Printed name)
>
> > ....(Address)
>
> Signed ...."[7]

Accordingly, the plain language of § 6.87(2) requires that it is the witness who must affix his or her signature and write in his or her name and address.  Section 6.87(2) does not mention an election official taking any action.

¶76  Wisconsin Stat. § 6.87(9) explains what an election official may do if an absentee ballot is received with an improperly completed certificate or no certificate:

> [T]he clerk may return the ballot to the elector, inside the sealed envelope when an envelope is received, together with a new envelope if necessary, whenever time permits the elector to correct the defect and return the ballot within the period authorized under sub. (6).

Section 6.87(9)'s plain language authorizes election officials to return the ballot to "the elector" to correct "the defect."  It does not authorize election officials to make corrections, i.e., to write anything on the certificate.

¶77  In addition, Wis. Stat. § 6.87(6d) provides that "[i]f a certificate is missing the address of a witness, the ballot may not be counted."  This language is clear.  And furthermore, its legislative history confirms its plain meaning.  Westmas v. Creekside Tree Serv., Inc., 2018 WI 12, ¶20, 379 Wis. 2d 471, 907 N.W.2d 68 (quoting State v. Grunke, 2008 WI 82, ¶22, 311 Wis. 2d 439, 752 N.W.2d 769) (explaining that courts may consult legislative history to confirm a statute's plain meaning).  This subsection was added by 2015 Wis. Act 261.  A memorandum prepared

---

7 Asterisks removed.

by the Legislative Council provides that "Act 261 . . . requires an absentee ballot to have a witness address to be counted. An absentee ballot voter must complete the certification and sign the certification in the presence of a witness, and the witness must sign the certificate and provide his or her name and address." Wis. Legis. Council Act Memo, 2015 Wis. Act 261, at 2, https://docs.legis.wiscinsin.gov/2015/related/lcactmemo/act261.pdf.

¶78 The contention that ballots with defective addresses cannot be counted is supported by more than the plain meaning of Wis. Stat. § 6.87(6d). The requirement that such ballots not be counted is found in Wis. Stat. § 6.84(2), which provides that the provisions in § 6.87(6d) are "mandatory."

¶79 Notwithstanding the plain, clear requirements of two statutes, WEC's guidance explicitly directs municipal clerks that they "must take corrective actions in an attempt to remedy a witness address error." WEC guidance states, "municipal clerks shall do all that they can reasonably do to obtain any missing part of the witness address." Then in addition, the WEC instructs clerks to add witness address information even though the guidance acknowledges that "some clerks have expressed [concern] about altering information on the certificate envelope, especially in the case of a recount."

¶80 The WEC ignores that the legislature provided only one act an election official may take in regard to a defective witness address: mail the defective ballot back to the elector to correct the error. Wis. Stat. § 6.87(9). That the legislature made one

9

choice about correcting a defective witness address excludes other methods of correction. "[T]he express mention of one matter excludes other similar matters [that are] not mentioned." FAS, LLC v. Town of Bass Lake, 2007 WI 73, ¶27, 301 Wis. 2d 321, 733 N.W.2d 287 (quoting Perra v. Menomonee Mut. Ins. Co., 2000 WI App 215, ¶12, 239 Wis. 2d 26, 619 N.W.2d 123) (modifications in the original). In addition, and similarly, § 6.87(2) states, "[t]he witness shall execute the following . . . (Address)." It does not state that clerks shall execute anything.

¶81 My conclusion that errors in the certification of absentee ballots require discarding those ballots is consistent with our precedent. In Kaufmann v. La Crosse City Bd. of Canvassers, 8 Wis. 2d 182, 98 N.W.2d 422 (1959), absentee ballots were returned to a municipal clerk without bearing a notary's signature on the accompanying certificate envelope, as required by statute at that time. The clerk added her signature to the certificates. Id. at 183. We explained that the electors' failure to ensure that the certificate complied with the statute invalidated the ballots. Additionally, we stated, "[t]he fact that the . . . clerk further complicated the matter by signing her name to the . . . certificate cannot aid the voter. The two wrongs cannot make a right." Id. at 186. The ballots were not counted. Id. In the case at hand, a defective witness address cannot be corrected by a clerk, just as the signature of the notary could not be completed by the clerk in Kaufmann.

¶82 In Gradinjan v. Boho (In re Chairman in Town of Worchester), 29 Wis. 2d 674, 139 N.W.2d 557 (1966), absentee

10

ballots were issued without the municipal clerk's initials or signature, as required by statute at that time. We concluded that the ballots "should not have been counted." Id. at 683. Furthermore, we said that the statute that obligated the invalidation of these ballots survived constitutional attack. Id. at 683-84. We emphasized that absentee voting is subject to different statutory requirements than voting at a polling place, i.e., while a ballot cast at a polling place without initials or a signature may be countable, an absentee ballot subject to an analogous defect is not. Id. at 684. As we stated, "[c]learly, the legislature could determine that fraud and violation of the sanctity of the ballot could much more readily be perpetrated by use of an absentee ballot than under the safeguards provided at a regular polling place." Id. In the case at hand, a witness address is a statutory requirement, mandated by law, just as the initials or signature of the municipal clerk was in Gradinjan.

¶83 The canvassing boards deferred to the WEC's guidance about defective signatures and it appears that the circuit court did so as well when interpreting Wis. Stat. § 6.87. The circuit court stated:

> Adding, the requisite information by the clerk has been in effect since before the 2016 election. The election which Trump prevailed in Wisconsin, I believe, after a recount. It's longstanding, I believe it's not prohibited by law, and it is therefore a reasonable interpretation to make sure, as the as the Court indicated earlier, that the will of the electors, the voters, are brought to fruition.

It is unfortunate that WEC has such sway, especially when its "guidance" is contrary to the plain meaning of two statutes.

11

¶84 Furthermore, we do not defer to administrative agencies when interpreting statutes. Wis. Stat. § 227.57(11); see also Lamar Cent. Outdoor, LLC v. Div. of Hearings & Appeals, 2019 WI 109, ¶9, 389 Wis. 2d 486, 936 N.W.2d 573 (quoting Tetra Tech EC, Inc. v. DOR, 2018 WI 75, ¶108, 382 Wis. 2d 496, 914 N.W.2d 21). Accordingly, the issue is not whether the WEC adopted "a reasonable interpretation," as the circuit court seems to have suggested. We follow the plain meaning rule when interpreting statutes, which we do independently. State ex rel. Kalal v. Circuit Court for Dane Cnty., 2004 WI 58, ¶45, 271 Wis. 2d 633, 681 N.W.2d 110. "If the meaning of the statute is plain, we ordinarily stop the inquiry." Id., ¶45 (quoting Seider v. O'Connell, 2000 WI 76, ¶43, 236 Wis. 2d 211, 612 N.W.2d 659).

¶85 And finally, guidance documents "are not law, they do not have the force or effect of law, and they provide no authority for implementing or enforcing standards or conditions." Service Emps. Int'l Union, Local 1 v. Vos, 2020 WI 67, ¶102, 393 Wis. 2d 38, 946 N.W.2d 35. Guidance documents "impose no obligations, set no standards, and bind no one." Id. "Functionally, and as a matter of law, they are entirely inert." Id.

¶86 Administrative agencies, including the WEC, often treat their guidance as if it were law, but that does not make it so. Id., ¶143 (Roggensack, C.J, concurring/dissenting). Such treatment is inappropriate——it confuses people by making them think that they have a legally cognizable reliance interest in WEC's guidance when they do not.

D. Written Applications

12

¶87 The Petitioners assert that during the two weeks that permit early in-person absentee voting 170,151 electors who did not submit a sufficient "written application" before receiving an absentee ballot cast votes. The crux of the Petitioners' argument is that the written application must be "separate" from the ballot and the certification.

¶88 The statutes provide that in the two weeks leading up to an election, electors may go to the municipal clerk's office and apply for an absentee ballot. Upon proof of identification, the elector receives a ballot, marks the ballot, the clerk witnesses the certification and the elector casts a vote by returning the absentee ballot to the municipal clerk. Wis. Stat. § 6.86(1)(b).

¶89 Pursuant to Wis. Stat. § 6.86(1)(ar), "the municipal clerk shall not issue an absentee ballot unless the clerk receives a written application therefor from a qualified elector." Other statutes provide for similar requirements. See, e.g., Wis. Stat. § 6.86(1)(a)1.-6. (stating that "[a]ny elector of a municipality who is registered to vote . . . and who qualifies . . . as an absent elector may make written application to the municipal clerk of that municipality for an official ballot by one of the following methods," which are then listed); Wis. Stat. § 6.86(1)(ac) (stating that electors "may make written application to the municipal clerk for an official ballot by means of facsimile transmission or electronic mail").

¶90 We begin statutory interpretation with the language of the statute. Kalal, 271 Wis. 2d 633, ¶45. "Statutory language is given its common, ordinary, and accepted meaning, except that

13

technical or specially-defined words or phrases are given their technical or special definitional meaning." Id.

¶91 None of the statutes in question contain the word "separate." Rather, a "written application" is required before the elector's identity is established with a photo identification and the elector receives an absentee ballot. See Wis. Stat. §§ 6.86(1)(a), (ac), (ar), (b), 6.86(2m). Furthermore, § 6.86(2m) provides that "The application form and instructions shall be prescribed by the commission . . . ." Here, the statutes do not provide a form application; the statutes do not define what is required on an application, but simply that it be written. Form EL 122 was employed here to apply for a ballot in-person.

¶92 Form EL 122 requires the applicant for an absentee ballot to provide the applicant's name, street address, city, and zip code. It also asks for the date of the election for which the application is being made and the county and municipality in which the applicant votes. The substantive information that the application requests is substantially similar to form EL 121, which is titled "Wisconsin Application for Absentee Ballot." Each of these application forms requires writing prior to being submitted by electors in advance of an elector receiving an absentee ballot.[8]

E. Indefinitely Confined

---

[8] This order of operations was confirmed in several affidavits. The affiants asserted that before they received their ballots the clerk's office verified their photo identification and voter registration. The electors were then given an EL-122 envelope and instructed to complete it. Once the application was completed, the voters received their ballots.

14

¶93 Wisconsin Stat. § 6.86(2)(a) provides a manner by which some electors may obtain an absentee ballot outside of the mode outlined above. Those who are "indefinitely confined because of age, physical illness or infirmity or are disabled for an indefinite period" may apply for an absentee ballot on that basis. Id. Those electors are then excused from the absentee ballot photo identification requirement. Wis. Stat. § 6.87(4)(b)1.

¶94 The Petitioners contend that all votes cast by electors claiming indefinitely confined status after March 25, 2020 (the date of McDonell's Facebook post)[9] are invalid. However, we have discussed the indefinitely confined status in Jefferson v. Dane Cnty., 2020 WI 90, ___ Wis. 2d ___, ___ N.W.2d ____, which is released today, December 14, 2020.

¶95 In the pending matter, we do not have sufficient information about the 28,395 absentee voters who claimed this status in Milwaukee and Dane counties to determine whether they lawfully asserted that they were indefinitely confined prior to receiving an absentee ballot. Therefore, I go no further in addressing this contention.

F. Democracy in the Park

¶96 On September 26, 2020 and October 3, 2020, at more than 200 City of Madison parks,[10] the City of Madison held events called, "Democracy in the Park." During those events, poll workers, also

---

[9] On March 25, 2020, Dane County Clerk, Scott McDonell, stated on Facebook that community members are encouraged to claim indefinitely confined status due to COVID-19 and Governor Evers' then-active Emergency Order #12.

[10] Affidavit of Maribeth Witzel-Behl, Madison City Clerk.

referred to as "election inspectors," helped in the completion of ballot envelopes, acted as witnesses for voters and collected completed ballots.[11] 17,271 absentee ballots were voted and delivered to these poll workers.[12]

¶97 The poll workers who staffed Democracy in the Park were volunteers. They were not employees of the City of Madison Clerk's office.

¶98 Wisconsin Stat. § 6.87(4)(b)1. requires that when voting an absentee ballot "[t]he envelope [containing the ballot] shall be mailed by the elector, or delivered in person, to the municipal clerk issuing the ballot or ballots." In addition, the plain words of Wis. Stat. § 6.84(2) specifically direct that the provisions of § 6.87(4)(b)1. "shall be construed as mandatory." Notwithstanding the use of "shall" in § 6.87(4)(b)1. and the "mandatory" requirement to comply with the terms of § 6.87(4)(b)1. in § 6.84(2), the 17,271 ballots that were collected in Madison parks did not comply with the statutes. Stated otherwise, they were not "delivered in person, to the municipal clerk."

¶99 It is conceivable that the 200 sites for Democracy in the Park could have become alternate absentee ballot sites. If the Madison Common Council had chosen to designate a site other than the municipal clerk's office as the location from which voters could request and to which they could return absentee ballots, an alternate absentee ballot site could have been established. Wis. Stat. § 6.855(1). The statute also provides that the governing

---

[11] Id.

[12] Id.

16

body of a municipality may designate more than one alternate site. § 6.855(5).[13]

¶100 However, if Democracy in the Park were held to be 200 alternate absentee ballot sites, then "no function related to voting and return of absentee ballots. . . . may be conducted in the office of the municipal clerk." Wis. Stat. § 6.855(1). This requirement does not fit the facts because the Madison clerk's office continued to provide and accept return of absentee ballots. Therefore, these 200 park events do not meet the statutory criteria set out in § 6.855 for alternate absentee ballot sites.

¶101 One wonders, what were they? It is contended that they were "human drop boxes." That gives little comfort because drop boxes are not found anywhere in the absentee voting statutes. Drop boxes are nothing more than another creation of WEC to get around the requirements of Wis. Stat. § 6.87(4)(b)1. The plain, unambiguous words of § 6.87(4)(b)1. require that voted ballots "shall be mailed by the elector, or delivered in person, to the municipal clerk issuing the ballot or ballots." Drop boxes do not meet the legislature's mandatory directive.

¶102 However, because drop boxes are not separately identified as a source of illegal voting in this lawsuit, I will not dwell on the accountability problems they create, but I do not doubt that challenges to drop boxes in general and in specific instances will be seen as problems in future elections. Therefore,

---

[13] However, 200 alternate sites does seem a bit much.

17

we may have the opportunity to examine them in a case arising from a subsequent election.[14]

¶103 It is also Respondent's contention that the poll workers who staffed these events were agents[15] of the city clerk; and therefore, delivery of ballots to them was personal delivery to the clerk within the meaning of Wis. Stat. § 6.87(4)(b)1. This is an amazing contention. Without question, delivery to voluntary poll workers is not "delivered in person to the municipal clerk," as § 6.87(4)(b)1. requires.

¶104 The legislature prescribed the absentee voting procedure in Wis. Stat. § 6.87(4)(b)1. and commanded that those procedures are "mandatory" in Wis. Stat. § 6.84(2). Gatherings in 200 city parks did not meet the statutory requirements for lawful absentee voting. They also lack the safety and solemnity that are attached to personally delivering absentee ballots to the municipal clerk.

### III. CONCLUSION

¶105 The Milwaukee County Board of Canvassers and the Dane County Board of Canvassers based their decisions on erroneous advice when they concluded that changes clerks made to defective witness addresses were permissible. And, the Dane County Board of

---

[14] We had the opportunity to examine the use of drop boxes in Mueller v. Jacobs, 2020AP1958-OA, but the court refused to grant review, from which decision Annette Kingsland Ziegler, J., Rebecca Grassl Bradley, J. and I dissented.

[15] I would be amazed if the City of Madison agreed that all the volunteer poll workers who staffed Democracy in the Park were legally agents of the city clerk given the exposure to liability such a determination would bring. Lang v. Lions Club of Cudahy Wis., Inc., 2020 WI 25, ¶25, 390 Wis. 2d 627, 939 N.W.2d 582 (lead opinion).

Canvassers erred again when it approved the 200 locations for ballot collection that comprised Democracy in the Park. The majority does not bother addressing what the boards of canvassers did or should have done, and instead, four members of this court throw the cloak of laches over numerous problems that will be repeated again and again, until this court has the courage to correct them. The electorate expects more of us, and we are capable of providing it. Because we do not, I respectfully dissent.

¶106 I am authorized to state that Justices ANNETTE KINGSLAND ZIEGLER, and REBECCA GRASSL BRADLEY join this dissent.

19

¶107 ANNETTE KINGSLAND ZIEGLER, J. *(dissenting)*. We are called upon to declare what the law is. See <u>Marbury v. Madison</u>, 5 U.S. (1 Cranch) 137, 177 (1803) ("It is emphatically the province and duty of the judicial department to say what the law is."). Once again, in an all too familiar pattern, four members of this court abdicate their responsibility to do so. They refuse to even consider the uniquely Wisconsin, serious legal issues presented. The issues presented in this case, unlike those in other cases around the United States, are based on Wisconsin statutory election law. Make no mistake, the majority opinion fails to even mention, let alone analyze, the pertinent Wisconsin statutes. Passing reference to other states' decisionmaking is of little relevance given the Wisconsin legal issues at stake. See Roggensack, C.J., dissent, <u>supra</u>; Rebecca Grassl Bradley, J., dissent, <u>infra</u>. The people of Wisconsin deserve an answer——if not for this election, then at least to protect the integrity of elections in the future. Instead of providing clarity, the majority opinion is, once again, dismissive of the pressing legal issues presented.

¶108 The majority author's concurrence is even more dismissive of the need for clarity in Wisconsin election law stating that he "understand[s] the desire for at least some clarity regarding the underlying election administration issues . . . [but] its just not possible." Hagedorn, J., concurrence, ¶36. Indeed, we are presented with a rare opportunity to meaningfully engage in, among other things, a known conflict between guidance, given by an unelected committee, and what the law requires. These are more than mere "election administration

1

issues." <u>See</u> Rebecca Grassl Bradley, J., dissent, <u>infra</u>. This case presents not just a "desire" for clarity in the law, our constitutional duty requires us to declare what the law is. Quite obviously, defaulting to laches and claiming that it is "just not possible," is directly contradicted by the majority author's own undertaking. If it is important enough to address in his concurrence, then it should also satisfy the discretionary standard which overcomes the application of laches. Instead of undertaking the duty to decide novel legal issues presented, this court shirks its institutional responsibility to the public and instead falls back on a self-prescribed, previously unknown standard it calls laches.

¶109 Stated differently, the majority claims the petitioners were too late, should have acted earlier and therefore, the court is neutered from being able to declare what the law is. The majority basically reiterates respondents' soundbites. In so doing, the majority seems to create a new bright-line rule that the candidates and voters are without recourse and without any notice should the court decide to later conjure up an artificial deadline concluding that it prefers that something would have been done earlier. That has never been the law, and it should not be today. It is a game of "gotcha." I respectfully dissent, because I would decide the issues presented and declare what the law is.

## I.  ABDICATION OF CONSTITUTIONAL DUTY

¶110 Unfortunately, our court's adoption of laches as a means to avoid judicial decisionmaking has become a pattern of conduct. A majority of this court decided not to address the issues in this

case, when originally presented to us by way of an original action. Trump v. Evers, No. 2020AP1971-OA, unpublished order (Wis. Dec. 3. 2020). In concluding that it is again paralyzed from engaging in pertinent legal analysis, our court unfortunately provides no answer or even any analysis of the relevant statutes, in the most important election issues of our time. See Hawkins v. Wisconsin Elections Comm'n, 2020 WI 75, 393 Wis. 2d 629, 948 N.W.2d 877; Trump v. Evers, No. 2020AP1971-OA (Rebecca Grassl Bradley, J., dissenting); Mueller v. Jacobs, No. 2020AP1958-OA, unpublished order (Wis. Dec. 3, 2020) (Roggensack, C.J., Ziegler, and Rebecca Grassl Bradley, JJ. dissenting); Wis. Voters Alliance v. Wisconsin Elections Comm'n, No. 2020AP1930-OA, unpublished order (Wis. Dec. 4, 2020) (Roggensack, C.J., dissenting).

¶111 Instead, the majority relies on what only can be viewed as a result-oriented application of the equitable doctrine of laches to avoid declaring what the law is. To be clear, I am not interested in a particular outcome. I am interested in the court fulfilling its constitutional responsibility. While sometimes it may be difficult to undertake analysis of hot-button legal issues——as a good number of people will be upset no matter what this court does——it is our constitutional duty. We cannot hide from our obligation under the guise of laches. I conclude that the rule of law and the equities demand that we answer these questions for not only this election, but for elections to come. I have concern over this court's pattern of indecision because that leaves no court declaring what Wisconsin election law is. See Roggensack, C.J., dissent, supra; Rebecca Grassl Bradley, J.,

3

dissent, infra. We can and should do better for the people of Wisconsin and for the nation, which depends on Wisconsin following its election laws.

¶112 Regarding this court's continued pattern of abdicating its responsibility concerning election issues, earlier this term in Hawkins, the same members of the court relied on laches, without any analysis whatsoever of that doctrine, and denied a rightful candidate the opportunity to be placed on the ballot as a presidential candidate. Thus, the court likewise denied the voters the opportunity to choose that candidate's name amongst the others on the ballot. See Hawkins, 393 Wis. 2d 629 (Ziegler, J., dissenting).[1] The court in Hawkins, about two months before the November election, declared that it was unable to act, citing the doctrine of laches, and applied a newly invented and previously unknown, self-imposed, result-oriented, laches-based deadline as an excuse for inaction. Id.

II. LACHES DOES NOT AND SHOULD NOT BAR THIS CASE

¶113 Once again, the majority imposes its definition of laches, which is tailored to its judicial preference rather than based on well-established legal principles. The majority must know that under this court's previous laches jurisprudence, it

---

[1] In 2016, the Green Party candidates received 31,072 votes. See Certificate of Ascertainment for President, Vice President and Presidential Electors General Election – November 8, 2016, available at https://www.archives.gov/files/electoral-college/2016/ascertainment-wisconsin.pdf. In 2020, the Green Party candidates received only 1,089 votes. See WEC Canvass Results for 2020 General Election, available at https://elections.wi.gov/sites/elections.wi.gov/files/Statewide%20Results%20All%20Offices%20%28pre-Presidential%20recount%29.pdf.

4

should nonetheless address the merits of the issues. As this court has consistently held, "[l]aches is an affirmative, equitable defense designed to bar relief when a claimant's failure to promptly bring a claim causes prejudice to the party having to defend against that claim." Wisconsin Small Bus. United, Inc. v. Brennan, 2020 WI 69, ¶11, 393 Wis. 2d 308, 946 N.W.2d 101. In Wisconsin, a defendant must prove three elements for laches to bar a claim: "(1) a party unreasonably delays in bringing a claim; (2) a second party lacks knowledge that the first party would raise that claim; and (3) the second party is prejudiced by the delay." Id., ¶12. Even if respondents carry their burden of proving all three elements of laches, "application of laches is left to the sound discretion of the court asked to apply this equitable bar." Id.

¶114 The petitioners raised four allegations regarding election administration: Absentee ballots lacking a separate application; absentee envelopes that are missing or have a defective witness address; indefinitely confined voters/faulty advice from election officials; and ballots cast at Madison's Democracy in the Park/ballot drop boxes. The respondents cannot demonstrate that laches bars a single one of these claims, and, even if they could, the court could still and should exercise its discretion to hear these issues.

A. No Unreasonable Delay

¶115 The first element of a laches defense requires the respondents to prove the petitioners unreasonably delayed in making their allegations. "What constitutes a reasonable time

5

will vary and depends on the facts of a particular case." Wisconsin Small Bus. United, 393 Wis. 2d 308, ¶14.

¶116 Convenient to its purpose, the majority frames this case to meet its preferred outcome. The majority characterizes this suit as a challenge to general election policies rather than what it is: this lawsuit is a challenge to specific ballots that were cast in this election, contrary to the law. The majority states, "[t]he time to challenge election policies such as these is not after all ballots in the election have been cast and the votes tallied." Majority op., ¶22. According to the majority, "[s]uch delay in light of these specific challenges is unreasonable." Id. The majority misses the mark.

¶117 In other words, contrary to the majority's characterizations, this case is not about general election procedure: it is about challenging specific ballots. In Wisconsin, while voting is a right, absentee voting is a privilege, not a right. Wis. Stat. § 6.84(1). The Wisconsin Legislature has created a set of mandatory rules to which the voters must adhere for their absentee ballots to count.[2] Consistent with express mandatory rules, the petitioners allege that certain ballots were cast that did not adhere to the law and, therefore, should not be counted. It is a specific question: Were the ballots cast

---

[2] See Wis. Stat. § 6.84(2) ("Notwithstanding s. 5.01(1), with respect to matters relating to the absentee ballot process, ss. 6.86, 6.87(3) to (7) and 9.01(1)(b)2. and 4. shall be construed as mandatory. Ballots cast in contravention of the procedures specified in those provisions may not be counted. Ballots counted in contravention of the procedures specified in those provisions may not be included in the certified result of any election.").

6

according to the law as stated in the statutes and if not, what, if any, remedy, exists?

¶118 With this proper framing of the issue, it is clear that the petitioners did not unreasonably delay in challenging the ballots. To somehow require that challenges must be made and legal relief given before an election, before the ballots are cast and before a recount is absurd. No recount would ever amount to relief if that is the lodestar.

¶119 Thus, the petitioners did not unreasonably delay in filing this suit, and this element of laches has not been demonstrated as to any of the four allegations of election irregularity.

   B.   Respondents Knew Ballots Would Be Challenged.

¶120 The second element of laches addresses the knowledge of the party asserting laches. See Wis. Small Bus. United, 393 Wis. 2d 308, ¶18. If the party lacks knowledge of claim, the respondents have satisfied this element. Id. The majority summarily accepts, without any analysis, that "[t]he respondents all . . . were unaware that the Campaign would challenge various election procedures after the election . . . ." Majority op., ¶23. Virtually nothing is in the record to support this assertion other than the parties' statements. In other words, the majority accepts one side's statements as fact in order to disallow the other side its day in court.

¶121 As explained above, this is a challenge to the ballots cast in this election. The President tweeted numerous times shortly after Wisconsin announced the election results that he

7

would challenge the results and prove certain ballots were impermissibly cast.[3] The majority chose to accept the respondents' assertion that they did not see this lawsuit coming despite the record to the contrary.

¶122 Moreover, the majority is incorrect that "nothing in the record suggests" that the respondents knew what the petitioners would be challenging. Majority op., ¶23. In fact, Wisconsin law mandates that the petitioners expressly declare on what grounds they plan to challenge the ballots in a recount. Wis. Stat. § 9.01(1). In the petitioners' recount petition, the petitioners specifically laid out these claims.

¶123 Thus, the majority's conclusion with respect to this element is particularly lean given the record. It is at least more than plausible that respondents had knowledge that the petitioners would challenge the ballots in a lawsuit.

C. Respondents Lack Prejudice.

¶124 Even if the respondents could prove the first two elements, the respondents themselves are not prejudiced by this delay. "What amounts to prejudice . . . depends upon the facts and circumstances of each case, but it is generally held to be anything that places the party in a less favorable position." Wis. Small Bus. United, 393 Wis. 2d 308, ¶19. The party seeking to apply laches must "prove that the unreasonable delay" prejudiced the party, not a third party. State ex rel. Wren v. Richardson, 2019 WI 110, ¶32, 389 Wis. 2d 516, 936 N.W.2d 587. This court

---

[3] See, e.g., Donald J. Trump (@realDonaldTrump), Twitter (Nov. 28, 2020, 2:00 p.m.), https://twitter.com/realDonaldTrump/status/1332776310196883461

recognizes two different types of prejudice: evidentiary and economic. Id., ¶33. Evidentiary prejudice is where "the defendant is impaired from successfully defending itself from suit given the passage of time." Id., ¶33 n.26. Economic prejudice occurs when "the costs to the defendant have significantly increased due to the delay." Id.

¶125 The majority abandons these principles of laches and instead focuses on the prejudice to third parties. The majority states that "[t]o strike ballots cast in reliance on the guidance now, and to do so in only in two counties, would violate every notion of equity that undergirds our electoral system." Majority op., ¶25. This is a new manner in which to approach the legal analysis of prejudice. The majority does not explain how this potential remedy prevents us from hearing the merits of this case. The majority does not explain how these notions are either evidentiary or economic prejudice, nor does it consider how it prejudices the actual parties in this case. It is unusual to conclude that overwhelming prejudice exists such that the court is paralyzed from considering whether the law was followed. In other words, the majority seems to be saying that they do not wish to grant relief and therefore they will not analyze the law. This remedy-focused analysis is not typical to laches.

¶126 Neither type of prejudice applies to the respondents in this case. None of the respondents claimed that they were unable to successfully defend themselves. All respondents filed briefs in this court addressing the merits. The circuit court's opinion addresses the merits. Accordingly, evidentiary prejudice does not

9

apply. Furthermore, no respondents have claimed that the costs of defending this claim have "significantly increased due to the delay." Accordingly, economic prejudice does not apply.

¶127 At a more fundamental level, the respondents must prove each of the elements. The court cannot presume that the elements are met. Similarly, the court cannot assume that a party cannot successfully defend itself nor that a party faces "significantly increased" costs. To do so forces this court to step out of our role as a neutral arbiter. See Service Emp. Int'l Union, Loc. 1 v. Vos, 2020 WI 67, ¶24, 393 Wis. 2d 38, 946 N.W.2d.

¶128 Therefore, the respondents cannot prove and did not even allege that they are prejudiced. Accordingly, the majority determination in this regard is flawed.

### D. Equitable Discretion

¶129 Even if the majority was correct that the elements of laches are met here, it still has the discretion to reach the merits. See Wis. Small Bus. United, 393 Wis. 2d 308, ¶12. The majority claims that the "only just resolution of these claims" is to use laches to not address the merits of this case. Majority op., ¶29. Not so. Our constitutional responsibility is to analyze the law and determine if it was followed regardless of whether any remedy might be available. In this way future elections benefit from our analysis. Curiously, it is unclear whether there is an actual majority given the fact that the writer does exercise his discretion to address the issues——again, a lack of clarity.

¶130 This court should address the merits because we should declare what the law is. The public has serious concerns about

10

the election and about our election laws. Recent polls suggest that the American public, regardless of party affiliation, has serious questions about the integrity of the November 2020 election.[4] Our court has an opportunity to analyze the law and answer the public's concerns, but it unfortunately declines this opportunity for clarification.

¶131 The majority should declare what the law is. Every single voter in this state is harmed when a vote is cast in

---

[4] See Rasmussen Reports, 61% Think Trump Should Concede to Biden (Nov. 19, 2020) https://www.rasmussenreports.com/ public_content/politics/elections/election_2020/61_think_trump_s hould_concede_to_biden (finding 47% of those who polled believe that Democrats stole votes or destroy pro-Trump ballots in several states to ensure that Biden would win); Politico, National Tracking Poll, Project 201133 (Nov. 6-9, 2020), https://www.politico.com/f/?id=00000175-b306-d1da-a775- bb6691050000 (finding 34% of those polled believed the election was not free and fair); Jill Darling et al., USC Dornsife Daybreak Poll Topline at 14 (Nov. 19, 2020), Post-Election Poll UAS318, https://dornsife-center-for-political-future.usc.edu/past-polls- collection/2020-polling/ (finding that those polled are only 58% confident that all votes in the election were accurately counted); R. Michael Alvarez, et al., Voter Confidence in the 2020 Presidential Election: Nationwide Survey Results (Nov. 19, 2020), The Caltech/MIT Voting Technology Project Monitoring the Election, 2020 Presidential Election Survey Reports & Briefs, https://monitoringtheelection.us/2020-survey (finding 39% of those polled are not confident that votes nationally were counted as the voter intended); Yimeng Li, Perceptions of Election or Voter Fraud in the 2020 Presidential Election: Nationwide Survey Results (Nov. 23, 2020), The Caltech/MIT Voting Technology Project Monitoring the Election, 2020 Presidential Election Survey Reports & Briefs, https://monitoringtheelection.us/2020-survey (finding between 29% and 34% of those polled believe voter fraud occurs); Sharp Divisions on Vote Counts, as Biden Gets High Marks for His Post-Election Conduct, Pew Research Center, U.S. Politics & Policy (Nov. 20, 2020), https://www.pewresearch.org/politics/ 2020/11/20/sharp-divisions-on-vote-counts-as-biden-gets-high- marks-for-his-post-election-conduct/ (finding that 41% of hose polled believe the elections were run and administered not well).

11

contravention of the statutes. See Wis. Stat. § 6.84(1). This court should conduct a rigorous analysis, and determine whether the law was followed.

¶132 To counter these clear equities counseling us to reach the merits, the majority nonetheless seemingly declines the opportunity in favor of a self-divined rule which would make it nearly impossible to know when and how such a claim could be made. The majority asserts that "[f]ailure to [raise these claims earlier] affects everyone, causing needless litigation and undermining confidence in the election results. It also puts courts in a difficult spot. Interpreting complicated election statutes in days is not consistent with best judicial practices." Majority op., ¶30. A claim post-recount is always going to be tight on timing.

¶133 Under the majority's new rule, a candidate will have to monitor all election-related guidance, actions, and decisions of not only the Wisconsin Elections Commission, but of the 1,850 municipal clerks who administer the election at the local level. And that is just in one state! Instead of persuading the people of Wisconsin through campaigning, the candidate must expend precious resources monitoring, challenging, and litigating any potential election-related issue hoping that a court might act on an issue that may very well not be ripe. Moreover, it would be nonsensical for a candidate, or worse, a disenfranchised voter, to challenge an election law. Thus, the majority's new rule does not prevent "needless litigation"; it spawns it in the form of preventative lawsuits to address any possible infraction of our

12

election laws. We have the opportunity to answer important legal questions now and should do so.

¶134 Similarly, the majority claims by not analyzing the law it is bolstering public confidence. I disagree. As explained, the American public has serious questions about the previous election. See supra, ¶23 n.4. Instead of addressing these serious questions, the majority balks and says some other party can bring a suit at a later date. See majority op., ¶31 n.11. Lawsuits are expensive and time-consuming and require that the person bringing one has a claim. These issues are presented here before us today. If they are important enough to answer at a later date, they are important to answer in this pending lawsuit today. Addressing the merits of this case would bolster confidence in this election and future elections. Even if the court does not conclude that relief should be granted, this lawsuit is the opportunity to declare what the law is——which is our constitutional duty——and will help the public have confidence in the election that just occurred and confidence in future elections. An opinion of this court on the merits would prevent any illegal or impermissible actions of election officials going forward. See Roggensack, C.J., dissent, supra; Rebecca Grassl Bradley, J., dissent, infra. Accordingly, I fail to see how addressing the merits in this case would undermine confidence in the election results. If anything, addressing the merits will reassure the people of Wisconsin and our nation that our elections comport with the law and to the extent that the legislature might need to act, it is clear where

13

the law might be that needs correction. The court's indecision creates less, not more clarity.

¶135 The majority's decision not to address the merits suffers from an even more insidious flaw——it places the will of this court and the will of the Wisconsin Elections Commission above the express intent of the legislature. The majority uses the potential remedy, striking votes, as an equitable reason to deny this case. Majority op., ¶31. But the majority ignores that the legislature specifically set forth a remedy that absentee ballots cast in contravention of the statute not be counted. See Wis. Stat. § 6.84(2). When the law is not followed, the counting of illegal ballots effectively disenfranchises voters. This past election, absentee voting was at an extraordinarily high level.[5] Perhaps this is why it mattered more now than ever that the law be followed. Also this might explain why the process has not been objected to before in the form of a lawsuit like this one. The majority gives virtually no consideration to this fact.

¶136 Despite the fact that the majority relies on laches to not declare the law in nearly all respects of the challenges raised, it nonetheless segregates out the indefinitely confined voter claim to analyze. Notably absent is any explanation why this claim is not treated like the other challenges.

¶137 Therefore, the majority's application of laches here is unfortunate and doomed to create chaos, uncertainty, undermine confidence and spawn needless litigation. Instead of declaring

---

[5] In 2016, 830,763 electors voted using absentee ballots. In 2020, 1,957,514 electors voted using absentee ballots.

14

what the law is, the majority is legislating its preferred policy. It disenfranchises those that followed the law in favor of those who acted in contravention to it. This is not the rule of law; it is the rule of judicial activism through inaction.

### III. CONCLUSION

¶138 As I would not apply laches in the case at issue and instead would analyze the statutes and available remedies as well as the actions of the Wisconsin Elections Commission, I respectfully dissent.

¶139 I am authorized to state that Chief Justice PATIENCE DRAKE ROGGENSACK and Justice REBECCA GRASSL BRADLEY join this dissent.

15

¶140 REBECCA GRASSL BRADLEY, J. *(dissenting).* Once again, the majority of the Wisconsin Supreme Court wields the discretionary doctrine of laches as a mechanism to avoid answering questions of law the people of Wisconsin elected us to decide. Although nothing in the law compels its application, this majority routinely hides behind laches in election law cases no matter when a party asserts its claims. Whether election officials complied with Wisconsin law in administering the November 3, 2020 election is of fundamental importance to the voters, who should be able to rely on the advice they are given when casting their ballots. Rather than fulfilling its duty to say what the law is, a majority of this court unconstitutionally converts the Wisconsin Elections Commission's mere advice into governing "law," thereby supplanting the actual election laws enacted by the people's elected representatives in the legislature and defying the will of Wisconsin's citizens. When the state's highest court refuses to uphold the law, and stands by while an unelected body of six commissioners rewrites it, our system of representative government is subverted.

I

¶141 In Wisconsin, we have a constitution, and it reigns supreme in this state. "By section 1 of article 4 the power of the state to deal with elections except as limited by the Constitution is vested in the senate and assembly to be exercised under the provisions of the Constitution; therefore the power to prescribe the manner of conducting elections is clearly within the province of the Legislature." State v. Kohler, 200 Wis. 518, 228 N.W. 895, 906 (1930) (emphasis added). The Wisconsin Elections

1

Commission (WEC) possesses <u>no</u> authority to prescribe the manner of conducting elections; rather, this legislatively-created body is supposed to <u>administer</u> and <u>enforce</u> Wisconsin's election laws. Wis. Stat. §§ 5.05(1) and (2m). While WEC may not create any law, it may "[p]romulgate rules under ch. 227 . . . for the purpose of <u>interpreting</u> or <u>implementing</u> the laws regulating the conduct of elections . . . ." Wis. Stat. § 5.05(1)(f) (emphasis added). It is undisputed that the advice rendered by WEC was not promulgated by rule but took the form of guidance. "A guidance document does not have the force of law." Wis. Stat. § 227.112(3). WEC's guidance documents are merely "communications <u>about</u> the law——they are not the law itself." <u>Serv. Employees Int'l Union, Local 1 v. Vos</u>, 2020 WI 67, ¶102, 393 Wis. 2d 38, 946 N.W.2d 35. The majority casts aside this black letter law, choosing to apply the majority's subjective concept of "equity" in order to reach the outcome it desires.[1] In doing so, the majority commits grave error by according WEC guidance the force of law.

¶142 Chapters 5 through 12 of the Wisconsin Statutes contain the state's enacted election laws. Section 5.01(1) states that "[e]xcept as otherwise provided, chs. 5 to 12 shall be construed to give effect to the will of the electors, if that can be ascertained from the proceedings, notwithstanding informality or failure to fully comply with some of their provisions." This

---

[1] During oral arguments in this case, Justice Jill J. Karofsky made the following statement (among others) to the President's attorney: "You want us to overturn this election so that your king can stay in power, and that is so un-American." When a justice displays such overt political bias, the public's confidence in the integrity and impartiality of the judiciary is destroyed.

substantial compliance provision does not apply to absentee balloting procedures, however: "Notwithstanding s. 5.01(1), with respect to matters relating to the absentee ballot process, ss. 6.86, 6.87(3) to (7) and 9.01(1)(b)2. and 4. shall be construed as mandatory. Ballots cast in contravention of the procedures specified in those provisions may not be counted. Ballots counted in contravention of the procedures specified in those provisions may not be included in the certified result of any election." Wis. Stat. § 6.84(2) (emphasis added).

¶143 "Section 6.84(2)'s strict construction requirement, applicable to statutes relating to the absentee ballot process, is consistent with the guarded attitude with which the legislature views that process." Lee v. Paulson, 2001 WI App 19, ¶¶7-8, 241 Wis. 2d 38, 623 N.W.2d 577. The legislature expressed its "guarded attitude" toward absentee balloting in no uncertain terms, drawing a sharp distinction between ballots cast in person versus those cast absentee: "The legislature finds that voting is a constitutional right, the vigorous exercise of which should be strongly encouraged. In contrast, voting by absentee ballot is a privilege exercised wholly outside the traditional safeguards of the polling place. The legislature finds that the privilege of voting by absentee ballot must be carefully regulated to prevent the potential for fraud or abuse; to prevent overzealous solicitation of absent electors who may prefer not to participate in an election; to prevent undue influence on an absent elector to vote for or against a candidate or to cast a particular vote in a referendum; or other similar abuses." Wis. Stat. § 6.84(1) (emphasis added). While the ascertainable will of the election-

3

day voter may prevail over a "failure to fully comply" with "some of" the provisions governing conventional voting (§ 5.01), any "[b]allots cast in contravention of" the law's absentee balloting procedures "may not be counted." Wis. Stat. § 6.84(2). This court has long recognized that in applying Wisconsin's election laws, "an act done in violation of a mandatory provision is void." Sommerfeld v. Bd. of Canvassers of City of St. Francis, 269 Wis. 299, 303, 69 N.W.2d 235 (1955) (emphasis added) (citation omitted).

¶144 In order "to prevent the potential for fraud or abuse" associated with absentee voting, the legislature requires the laws governing the absentee balloting process to be followed. Wis. Stat. § 6.84(1). If an absentee ballot is cast "in contravention" of the absentee balloting procedures, it "may not be counted." Wis. Stat. § 6.84(2). If an absentee ballot is counted "in contravention" of the absentee balloting procedures, it "may not be included in the certified result of any election." Id. Long ago, this court understood that "we are obliged to conclude that if absentee ballots are improperly delivered in contravention of [Wisconsin's statutes], the Board of Canvassers is under duty to invalidate and not include such ballots in the total count, whether they are challenged at the election, or not." Olson v. Lindberg, 2 Wis. 2d 229, 238, 85 N.W.2d 775 (1957) (emphasis added). Accordingly, if absentee ballots were counted in contravention of the law, the people of Wisconsin, through their elected representatives, have commanded the board(s) of canvassers to exclude those absentee ballots from the total count, independent of any legal challenge an aggrieved candidate may (or may not) bring.

4

¶145 The majority carelessly accuses the President of asking this court to "disenfranchise" voters. Majority op., ¶27; Justices Rebecca Frank Dallet's and Jill J. Karofsky's concurrence, ¶33. In the election context, "disenfranchise" means to deny a voter the right to vote.[2] Under Article III, Section 1 of the Wisconsin Constitution, "[e]very United States citizen age 18 or older who is a resident of an election district in this state is a qualified elector of that district." This court possesses no authority to remove any qualified elector's constitutionally-protected right to vote. But it is not "disenfranchisement" to uphold the law. "It is true that the right of a qualified elector to cast his ballot for the person of his choice cannot be destroyed or substantially impaired. However, the legislature has the constitutional power to say how, when and where his ballot shall be cast . . . ." State ex rel. Frederick v. Zimmerman, 254 Wis. 600, 613, 37 N.W.2d 472, 37 N.W.2d 473, 480 (1949). And the judiciary has the constitutional responsibility to say whether a ballot was cast in accordance with the law prescribed by the people's representatives.

¶146 Each of the President's legal claims challenge the counting of certain absentee ballots, which the President argues were cast in contravention of the Wisconsin Statutes. The majority misconstrues Wisconsin law in asserting that "[t]hese issues could have been brought weeks, months, or even years earlier." Majority op., ¶30. Section 9.01(11) of the Wisconsin Statutes provides

---

[2] Disenfranchise: "To deprive (someone) of a right, esp. the right to vote; to prevent (a person or group of people) from having the right to vote. — Also termed disfranchise." Disenfranchise, Black's Law Dictionary (11th ed. 2019).

5

that "[t]his section constitutes the exclusive judicial remedy for testing the right to hold an elective office as the result of an alleged irregularity, defect or mistake committed during the voting or canvassing process."  Only a "candidate voted for at any election who is an aggrieved party" may bring an action under Chapter 9.  Wis. Stat. § 9.01(1)(a).  Surely the majority understands the absurdity of suggesting that the President should have filed a lawsuit in 2016 or anytime thereafter.  Why would he? He was not "an aggrieved party"——he won.  Obviously, the President could not have challenged any "irregularity, defect or mistake committed during the voting or canvassing process" related to the November 3, 2020 election until that election occurred.

¶147 The respondents recognize that under Chapter 9, the "purpose of a recount . . . is to ensure that the voters, clerks and boards of canvassers followed the rules in place at the time of the election."  Misunderstanding what the governing rules actually are, the respondents argue that having this court declare the law at this point would "retroactively change the rules" after the election.  Justice Brian Hagedorn embraces this argument, using a misapplied football metaphor that betrays the majority's contempt for the law:  "the [President's] campaign is challenging the rulebook adopted before the season began."  Majority op., ¶32. Justices Rebecca Frank Dallet and Jill J. Karofsky endorse the idea that this court should genuflect before "the rules that were in place at the time."  Justices Dallet's and Karofsky's concurrence, ¶34.  How astonishing that four justices of the Wisconsin Supreme Court must be reminded that it is THE LAW that constitutes "the rulebook" for any election——not WEC guidance——

6

and election officials are bound to follow the law, if we are to be governed by the rule of law, and not of men.

¶148 As the foundation for one of the President's claims, Wis. Stat. § 6.87(6d) provides that "[i]f a certificate is missing the address of a witness, the ballot may not be counted." The only statutorily-prescribed means to correct that error is for the clerk to "return the ballot to the elector, inside the sealed envelope when an envelope is received, together with a new envelope if necessary, whenever time permits the elector to correct the defect and return the ballot within the period authorized." Wis. Stat. § 6.87(9). Contrary to Wisconsin law, WEC guidance says "the clerk should attempt to resolve any missing witness address information prior to Election Day if possible, and this can be done through reliable information (personal knowledge, voter registration information, through a phone call with the voter or witness)."[3] WEC's "Election Administration Manual for Wisconsin Municipal Clerks" erroneously provides that "[c]lerks may add a missing witness address using whatever means are available. Clerks should initial next to the added witness address."[4] Nothing in the election law statutes permits a clerk to alter witness address information. WEC's guidance in this regard does not administer or enforce the law; it flouts it.

---

[3] Memorandum from Meagan Wolfe to Wisconsin County and Municipal Clerks (Oct. 19, 2020), at https://elections.wi.gov/sites/elections.wi.gov/files/2020-10/Spoiling%20Ballot%20Memo%2010.2020.pdf.

[4] Wisconsin Elections Commission, Election Administration Manual for Wisconsin Municipal Clerks (Sept. 2020), at https://elections.wi.gov/sites/elections.wi.gov/files/2020-10/Election%20Administration%20Manual%20%282020-09%29.pdf.

7

II

¶149 Under the Wisconsin Constitution, "all governmental power derives 'from the consent of the governed' and government officials may act only within the confines of the authority the people give them. Wis. Const. art. I, § 1." Wis. Legislature v. Palm, 2020 WI 42, ¶66, 391 Wis. 2d 497, 942 N.W.2d 900 (Rebecca Grassl Bradley, J., concurring). The confines of the authority statutorily conferred on the WEC limit its function to administering and enforcing the law, not making it. The Founders designed our "republic to be a government of laws, and not of men . . . bound by fixed laws, which the people have a voice in making, and a right to defend." John Adams, Novanglus: A History of the Dispute with America, from Its Origin, in 1754, to the Present Time, in Revolutionary Writings of John Adams (C. Bradley Thompson ed. 2000) (emphasis in original). Allowing any person, or unelected commission of six, to be "bound by no law or limitation but his own will" defies the will of the people. Id.

¶150 The judiciary is constitutionally compelled to safeguard the will of the people by interpreting and applying the laws duly enacted by the people's representatives in the legislature. "A democratic state must therefore have the power to . . . prevent all those practices which tend to subvert the electorate and substitute for a government of the people, by the people and for the people, a government guided in the interest of those who seek to pervert it." State v. Kohler, 200 Wis. 518, 228 N.W. 895, 905 (1930). The majority's abdication of its judicial duty to apply the election laws of this state rather than the WEC's "rulebook"

8

precludes any legislative recourse short of abolishing the WEC altogether.

¶151 While some will either commend or condemn the court's decision in this case based upon its impact on their preferred candidate, the importance of this case transcends the results of this particular election. "A correct solution of the questions presented is of far greater importance than the personal or political fortunes of any candidate, incumbent, group, faction or party. We are dealing here with laws which operate in the political field——a field from which courts are inclined to hold aloof——a field with respect to which the power of the Legislature is primary and is limited only by the Constitution itself." Id. The majority's decision fails to recognize the primacy of the legislative power to prescribe the rules governing the privilege of absentee voting. Instead, the majority empowers the WEC to continue creating "the rulebook" for elections, in derogation of enacted law.

¶152 "The purity and integrity of elections is a matter of such prime importance, and affects so many important interests, that the courts ought never to hesitate, when the opportunity is offered, to test them by the strictest legal standards." State v. Conness, 106 Wis. 425, 82 N.W. 288, 289 (1900). Instead of determining whether the November 3, 2020 election was conducted in accordance with the legal standards governing it, the majority denies the citizens of Wisconsin any judicial scrutiny of the election whatsoever. "Elections are the foundation of American government and their integrity is of such monumental importance that any threat to their validity should trigger not only our

9

concern but our prompt action." State ex rel. Zignego v. Wis. Elec. Comm'n, 2020AP123-W (S. Ct. Order issued June 1, 2020 (Rebecca Grassl Bradley, J., dissenting)). The majority instead belittles the President's claims of law violations as merely "technical issues that arise in the administration of every election." Majority op., ¶31. The people of Wisconsin deserve a court that respects the laws that govern us, rather than treating them with such indifference.

¶153 "Confidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy." Purcell v. Gonzalez, 549 U.S. 1, 4 (2006). The majority takes a pass on resolving the important questions presented by the petitioners in this case, thereby undermining the public's confidence in the integrity of Wisconsin's electoral processes not only during this election, but in every future election. Alarmingly, the court's inaction also signals to the WEC that it may continue to administer elections in whatever manner it chooses, knowing that the court has repeatedly declined to scrutinize its conduct. Regardless of whether WEC's actions affect election outcomes, the integrity of every election will be tarnished by the public's mistrust until the Wisconsin Supreme Court accepts its responsibility to declare what the election laws say. "Only . . . the supreme court can provide the necessary clarity to guide all election officials in this state on how to conform their procedures to the law" going forward. State ex rel. Zignego v. Wis. Elec. Comm'n, 2020AP123-W (S. Ct. Order issued January 13, 2020 (Rebecca Grassl Bradley, J., dissenting)).

10

¶154 This case represents only the majority's latest evasion of a substantive decision on an election law controversy.[5] While the United States Supreme Court has recognized that "a state indisputably has a compelling interest in preserving the integrity of its election process[,]" Burson v. Freeman, 504 U.S. 191, 199 (1992), the majority of this court repeatedly demonstrates a lack of any interest in doing so, offering purely discretionary excuses like laches, or no reasoning at all. This year, the majority in Hawkins v. WEC declined to hear a claim that the WEC unlawfully kept the Green Party's candidates for President and Vice President off of the ballot, ostensibly because the majority felt the candidates' claims were brought "too late."[6] But when litigants have filed cases involving voting rights well in advance of Wisconsin elections, the court has "take[n] a pass" on those as well, thereby unfailingly and "irreparably den[ying] the citizens of Wisconsin a timely resolution of issues that impact voter rights and the integrity of our elections." State ex rel. Zignego v. Wis. Elec. Comm'n, 2020AP123-W (S. Ct. Order issued January 13,

---

[5] Hawkins v. WEC, 2020 WI 75, ¶¶84, 86, 393 Wis. 2d 629, 948 N.W.2d 877 (Rebecca Grassl Bradley, J., dissenting) ("The majority upholds the Wisconsin Elections Commission's violation of Wisconsin law, which irrefutably entitles Howie Hawkins and Angela Walker to appear on Wisconsin's November 2020 general election ballot as candidates for President and Vice President of the United States . . . . In dodging its responsibility to uphold the rule of law, the majority ratifies a grave threat to our republic, suppresses the votes of Wisconsin citizens, irreparably impairs the integrity of Wisconsin's elections, and undermines the confidence of American citizens in the outcome of a presidential election.").

[6] Hawkins v. Wis. Elec. Comm'n, 2020 WI 75, ¶5, 393 Wis. 2d 629, 948 N.W.2d 877 (denying the petition for leave to commence an original action).

11

2020 (Rebecca Grassl Bradley, J., dissenting)). Having neglected to identify any principles guiding its decisions, the majority leaves Wisconsin's voters and candidates guessing as to when, exactly, they should file their cases in order for the majority to deem them worthy of the court's consideration on the merits.

¶155 The consequence of the majority operating by whim rather than law is to leave the interpretation of multiple election statutes in flux——or worse yet, in the hands of the unelected members of the WEC. "To be free is to live under a government by law . . . . Miserable is the condition of individuals, danger is the condition of the state, if there is no certain law, or, which is the same thing, no certain administration of the law[.]" Judgment in Rex v. Shipley, 21 St Tr 847 (K.B. 1784) (Lord Mansfield presiding) (emphasis added). The Wisconsin Supreme Court has an institutional responsibility to interpret law——not for the benefit of particular litigants, but for citizens we were elected to serve. Justice for the people of Wisconsin means ensuring the integrity of Wisconsin's elections. A majority of this court disregards its duty to the people of Wisconsin, denying them justice.

* * *

¶156 "This great source of free government, popular election, should be perfectly pure." Alexander Hamilton, Speech at New York Ratifying Convention (June 21, 1788), in Debates on the Federal Constitution 257 (J. Elliot ed. 1876). The majority's failure to act leaves an indelible stain on our most recent election. It will also profoundly and perhaps irreparably impact all local, statewide, and national elections going forward, with grave

12

consequence to the State of Wisconsin and significant harm to the rule of law. Petitioners assert troubling allegations of noncompliance with Wisconsin's election laws by public officials on whom the voters rely to ensure free and fair elections. It is our solemn judicial duty to say what the law is. The majority's failure to discharge its duty perpetuates violations of the law by those entrusted to administer it. I dissent.

¶157 I am authorized to state that Chief Justice PATIENCE DRAKE ROGGENSACK and Justice ANNETTE KINGSLAND ZIEGLER join this dissent.